# EXHIBIT A

Gurbir S. Grewal
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, NJ 08625-0093
Tel.: (609) 376-2761
By:  Gwen Farley, Deputy Attorney General
Bar No. 000081999
*Attorneys for Plaintiffs*

Leonard Z. Kaufmann
  Atty. ID #045731994
  lzk@njlawfirm.com
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
*Special Counsel to the Attorney General*

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>MIDDLESEX COUNTY<br><br>DOCKET NO.: L-002448-19 |
| Plaintiffs, | |
| v. | Civil Action |
| E.I. DUPONT DE NEMOURS & COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT SPECIALTY PRODUCTS USA, LLC; 3M COMPANY; and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), | **FIRST AMENDED COMPLAINT AND JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiffs New Jersey Department of Environmental Protection

(the "Department" or "NJDEP"), the Commissioner of the New Jersey

Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively, the "Plaintiffs"), file this First Amended Complaint against the above-named defendants (the "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

1.      The Plaintiffs bring this civil action pursuant to the Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10-23.11 to -23.24; the Water Pollution Control Act (the "WPCA"), N.J.S.A. 58:10A-1 to -20; the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -13.1 ("ISRA"); the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 through 58:10B-31 (the "Brownfields Act"); the Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq. ("SWMA"); the Department's enabling statute, N.J.S.A. 13:1D-1, et seq.; the Uniform Fraudulent Transfer Act, Del. Code. tit. 6, §§ 1301 to 1312, N.J.S.A. 25:2-20 to 25:2-34; and the common law of New Jersey for cleanup and removal costs, damages, and other relief as a result of the discharges of hazardous substances and pollutants at and from the site at 250 Cheesequake Road, Parlin, Old Bridge Township, Sayreville Borough, Middlesex County (the "Parlin Site" or "Site").

2.      Such costs and damages include, but are not limited to: the costs of restoring natural resources of the State to their

pre-discharge condition; the costs of replacing natural resources; damages for the loss of use and value (including existence value) of natural resources; the costs of assessing natural resource injuries and damages; the unreimbursed costs of investigation, oversight, and remediation; the costs of restoring, repairing, or replacing natural resources damaged or destroyed by a discharge; any income lost from the time the natural resource is damaged to the time it is restored, repaired, or replaced; any reduction in value of the natural resource caused by the discharge by comparison to its value prior thereto; loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge; the economic benefits Defendants accrued, including any savings realized from avoided capital or noncapital costs for their unpermitted discharges; punitive damages; litigation fees and costs and pre-judgment interest.

3.     Since 1904, the DuPont Defendants, as defined herein, have engaged in the manufacturing, storing, and transport of a wide variety of products at the Parlin Site, and have generated a diverse and significant amount of hazardous waste throughout its operation, which include, but are not limited to, per- and polyfluoroalkyl substances ("PFAS"), various volatile organic compounds ("VOCs"), polycyclic aromatic hydrocarbons ("PAHs"), polychlorinated biphenyls ("PCBs"), and metals. The DuPont Defendants were aware of the dangers posed by PFAS as early as

1981.  After Defendant 3M Company ("3M") ceased production of PFAS, the DuPont Defendants themselves continued the manufacturing of PFAS.

4.      Following the discovery of PFAS in 1938, for most of the past several decades, 3M has been the primary manufacturer of PFAS, and began producing PFAS as raw materials for use in their own productions. 3M also sold and distributed PFAS to third parties for use in those parties' productions.  3M went on to market PFAS and products containing PFAS, and shipped PFAS to manufacturers all over the country, including to DuPont at various facilities, including the Parlin Site.  3M had actual knowledge of the risks posed by PFAS to the environment as early as 1963, and to human health as early as 1978.  After decades of obscuring the facts surrounding PFAS, including actively suppressing scientific research on the hazards associated with those products, and campaigning to control the scientific dialogue on PFAS, including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), but only in response to pressure from the Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

5.      The Parlin Site was comprised of approximately 350 acres until 2008, when the DuPont Defendants donated approximately 120 acres located along the eastern edge of the Site to the Borough of Sayreville.   Today,   the   Parlin   Site   is   comprised   of

approximately 230 acres. The Parlin Site is surrounded by residential neighborhoods, park land, commercial businesses, and schools; additionally, surface water bodies, and municipal wellfields are located nearby. The natural resources at and nearby the Site have been injured by the release of hazardous substances and pollutants.

6.     New Jersey seeks costs and damages for injuries to natural resources of the State, including surface water, groundwater, sediments, wetlands, air, soils, ecological resources, biota, and the public fisc resulting from Defendants' discharges of hazardous substances and pollutants at and from the Parlin Site. The State is bringing this action to require Defendants to pay all of the costs necessary to fully investigate and delineate all of the PFAS compounds and other pollutants and hazardous substances that were discharged, released, and/or emitted from the Parlin Site, wherever they may have come to rest. Likewise, the State is seeking that Defendants pay all costs necessary to investigate, remediate, assess, and restore the Site itself and all of the off-site areas and natural resources of New Jersey that have been contaminated from the Parlin Site. Additionally, in this litigation, the State is not asserting claims, costs, or damages associated with aqueous film-forming foam ("AFFF"), which is a particular product that contains PFAS compounds, as that is the subject of a separate action.

## **THE PARTIES**

7.     The Department is a principal department within the Executive Branch of the State government.  Under the leadership of the Commissioner, it is vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.  N.J.S.A. 13:1D-9; N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3.

8.     The State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction.  The Department is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State.  N.J.S.A. 58:10-23.11a.  In addition, the State may act in its _parens patriae_ capacity to protect the State's "quasi-sovereign" interests, including its interest in the health and well-being of its residents and the integrity of its natural resources.  The Department brings this case in its trustee, _parens patriae_, and regulatory (police power) capacities, as well as in its capacity as an owner of real property directly impacted by contamination originating from the Parlin Site.

9.     Plaintiff Commissioner is the Commissioner of the Department.  N.J.S.A. 58:10-23.11b; N.J.S.A. 58:10A-3; and N.J.S.A. 13:1B-2.  In this capacity, the Commissioner is vested by law with various powers and authority, including those conferred

by the Department's enabling legislation, N.J.S.A. 13:1D-1 to -19; N.J.S.A.13:1B-3.

10.   Plaintiff Administrator is the Chief Executive Officer of the New Jersey Spill Compensation Fund ("the Spill Fund"). N.J.S.A. 58:10-23.11j. As Chief Executive Officer of the Spill Fund, Plaintiff Administrator is authorized to approve and pay any cleanup and removal costs the Department incurs, N.J.S.A. 58:10-23.11f(c) and (d), and to certify the amount of any claim to be paid from the Spill Fund. N.J.S.A. 58:10-23.11j(d).

11.   Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware, with its main place of business located at 974 Centre Road, Wilmington, DE 19805.

12.   Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.   In 2015, DuPont spun off its performance chemicals business to Chemours, along with certain environmental liabilities.

13.   Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, PO Box 2047, Wilmington, Delaware 19899.

Chemours FC is a subsidiary of Chemours that was formed in April 2014.

14.     Together, Chemours Co. and Chemours FC are hereinafter referred to as "Chemours."

15.     Defendant DuPont Specialty Products USA, LLC is a limited liability company duly organized under the laws of the State of Delaware, with its main place of business located at 974 Centre Road, Wilmington, DE 19805.

16.     Collectively, Defendants DuPont, Chemours Co., Chemours FC, DuPont Specialty Products USA, LLC, and Defendant ABC Corporations (to the extent applicable), shall be referred to herein as the "DuPont Defendants."

17.     Defendant 3M Company, including Defendant ABC Corporations (to the extent applicable), is a corporation duly organized under the laws of the State of Delaware, with its main place of business located at 3M Center, St. Paul, Minnesota, 55144, and shall be referred to herein as "3M."

18.     Defendants "ABC Corporations" 1-10, these names being fictitious, are entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter.

## AFFECTED NATURAL RESOURCES

19.     The "natural resources" of this State are all land, fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust, or otherwise controlled by the State.  N.J.S.A. 58:10-23.11b.

20.     The natural resources of this State include the "waters of the State," which are the ocean and its estuaries, all springs, streams and bodies of surface water or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction.  N.J.S.A. 58:10A-3(t).

21.     New Jersey's habitats and ecosystems — forests, lakes, rivers, wetlands, agricultural lands, coastal estuaries, pinelands, and grasslands — are some of the most threatened in the nation.  They are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.

22.     Hazardous substances and pollutants have been found in the surface water, groundwater, soils, sediments, wetlands, air, and other natural resources at the Parlin Site.

23.     These natural resources have intrinsic (i.e., inherent existence) values.  The current and future residents of New Jersey have a substantial interest in a clean environment.

### Groundwater

24.     Groundwater — that is, water that exists beneath the Earth's surface — is an extremely important natural resource for

the people of New Jersey.  More than half of New Jersey's population obtains drinking water from groundwater sources, and more than 900 million gallons of water per day are used for that purpose.

25.     Private wells, which provide access to groundwater, were widely used in the residential communities around the Parlin Site.  Wells were used for drinking water, watering lawns, and filling swimming pools, among other things.

26.     Not only does groundwater serve as a source of potable water, it also serves as an integral part of the State's ecosystem. Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of the aquatic ecosystem.

27.     Groundwater also provides cycling and nutrient movement within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides ground stabilization, prevents sinkholes, and helps to maintain critical water levels in freshwater wetlands.

28.     Groundwater and the other natural resources of the State are unique resources that support the State's tourism industry, which helps sustain the State's economy.

29.     The Site lies in the Potomac-Raritan-Magothy aquifer system, more specifically on top of the Old Bridge Aquifer, which is only partially confined, and the Farrington Aquifer, which is

fully confined.  Groundwater within the Old Bridge Aquifer was also found to flow generally in an easterly to southeasterly direction, and in the northwestern area of the Site, the groundwater flow has a radial flow component due to a groundwater topographic high which accounts for groundwater flows to the south and southeast as well as to the north and northeast.  The Old Bridge Aquifer can be divided into two zones: the deep and the shallow.

30.    Groundwater and the other natural resources of the State are unique resources that support the State's tourism industry, which helps sustain the State's economy.  Groundwater is the primary source of water for domestic, industrial, and agricultural purposes in this part of Middlesex County.  The two aquifers under the Site are highly productive local sources of groundwater; at least six wellfields and production well areas are located within a two-mile radius of the Site.

31.    Hazardous substances and pollutants, discharged from the Parlin Site have reached and adversely impacted the groundwaters both on-Site and off-Site.

## Surface Water

32.    Surface waters are a critical ecological resource of New Jersey.  New Jersey's surface water — which includes all water in the State's lakes, streams, and wetlands — is a primary source of drinking water in the State.  Nearly half of New Jersey's

population obtains its drinking water from surface water sources, and approximately 850 million gallons of surface water per day is used for that purpose.

33.    Surface water in New Jersey is also used for other commercial and industrial purposes, such as cooling water and electrical generation, boating, fishing, and transportation of goods and services.

34.    The tourism and recreation industries, which are vital to the State's economy, are dependent on clean water and beaches.

35.    Surface waters also provide commercial, recreational, aesthetic, and ecological value, including by supporting aquatic ecosystems, nearby communities, and the citizens of the State.

36.    The surface waters located near the Site include, but are not limited to: the Drainage Channel, which flows into the Second Brook and ultimately the South River, a tributary of the Raritan River.

37.    Hazardous substances and pollutants, discharged from the Parlin Site have reached and adversely impacted the surface waters both on-Site and off-Site.

## Air

38.    Air resources are vital to life.  Pollution of air resources can injure human health and welfare, flora and fauna, and property, and can unreasonably interfere with the enjoyment of life and property in areas affected by such pollution.  Air

deposition (*i.e.*, deposits of air contaminants on the earth's surface) can also be a source of contamination to other types of natural resources, including surface water, groundwater, sediments and soils, wetlands, forests, air and biota.

39.     Upon information and belief, air pollution from activities at the Parlin Site have contaminated downwind natural resources.

40.     When subsurface air is contaminated with VOCs, the subsurface air (*i.e.*, soil gas) can become a source of contaminated air to the structures above, causing vapor intrusion.

### Sediments & Soils

41.     New Jersey's land and aquatic resources are comprised of unique and complex ecosystems.

42.     Sediments and soils are critical components of New Jersey ecological resources.

43.     Sediments and soils can sustain a wide diversity of plants and animals that are essential in a healthy food chain. Sediments are a vital part of the State's ecosystem.  They provide a living substrate for submerged and emergent flora, and support diverse invertebrate species, wading birds, and fish and shellfish populations.

44.     Hazardous substances and pollutants discharged at or released from the Parlin Site have adversely impacted sediments and soils both on-Site and off-Site.

## **Forests**

45.     Forests are a critical component of New Jersey's ecological resources.

46.     New Jersey's forests produce clean water and air, absorb runoff, provide recreation, and are home to thousands of species of wildlife.

47.     The Parlin Site contains wooded areas.

48.     Upon information and belief, hazardous substances and pollutants discharged at or released from the Parlin Site have adversely impacted forests both on-Site and off-Site.

## **Biota**

49.     Biota, including the flora and fauna of the State, are critical ecological resources. New Jersey is home to more than 2,000 plant species, which include entire communities of rare flora that cannot be found anywhere else in the world. Approximately 15% of the native plant species in New Jersey, however, are now at risk of extinction, with a total of 331 vascular plant species listed as endangered and an additional 32 that have already been extirpated.

50.     New Jersey wildlife includes approximately 900 species, including 90 mammal species, 79 reptile and amphibian species, more than 400 fish species, and approximately 325 species of birds. Approximately 1.5 million shorebirds and as many as 80,000 raptors make migratory stopovers here each year.

51.     At least 17% of New Jersey's native vertebrate species and 24% of its native invertebrate species are at risk of extinction.  Several threatened and endangered raptor species have difficulty breeding because of the bioaccumulation of toxic compounds.

52.     New Jersey's biodiversity provides a wealth of ecological, social, and economic goods and services that are an integral part of the ecological infrastructure for all cultural and economic activity in the State.

53.     New Jersey's ecosystems, however, are vulnerable to pollution, degradation, and destruction from the discharge of hazardous substances and pollutants.  Contamination from the discharge of hazardous substances and pollutants is one of the major causes of biodiversity loss.

54.     Natural resource injuries to biota in New Jersey negatively impact not only the individual species directly involved, but the capacity of the injured ecosystems to regenerate and sustain such life into the future.

55.     Hazardous substances and pollutants discharged at or released from the Parlin Site have adversely impacted biota both on Site and off Site.

## GENERAL ALLEGATIONS

56.     Historically, the Parlin Site was comprised of 350 acres of real property located at 250 Cheesequake Road, Parlin,

Old Bridge Township, Sayreville Borough, Middlesex County.   In December 2008, DuPont donated approximately 120 acres located along the eastern portion of the Site to the Borough of Sayreville, for use as greenspace.

57.    Today, the Parlin Site is comprised of approximately 230 acres, and is also designated and known as Block 27.01, Lot 1; Block 35 Lot 1.01; Block 36, Lot 1; Block 37, Lot 1; Block 38, Lot 1; Block 39, Lot 1; Block 41, Lot 1.04; Block 42, Lots 1.01, 1.02, 1.05, and 2.02, in the Borough of Sayreville.

58.    The Site is bounded by Washington Road to the north, the Raritan River Railroad to the west, and Cheesequake Road forms the southern boundary for the western two-thirds of the Site.   The Road divides the remaining, non-operational Site areas located on the eastern third of the property: 88 acres north of the Road, and 42 acres south of the Road.

59.    The Site is surrounded by municipal wellfields, public parks, middle schools and high schools, recreational facilities, commercial businesses, and residential neighborhoods.

### THE PARLIN SITE HISTORY

60.    In 1904, DuPont purchased the Site from International Smokeless Powder Company, which had manufactured gun cotton, a nitrocellulose-based product used as a propellant or a low-order explosive, beginning in or around 1890.   DuPont continued the manufacture of gun cotton until 1939.

16

61.   In or around 1920, DuPont began to produce photographic film, automotive paint, and other related products, and from the 1920s through 1986, manufacturing at the Site was divided into two distinct and separate operations managed by separate operating departments within DuPont.

62.   On the northern half of the Site was located the Automotive Products Plant, which manufactured paints, pigments, adhesives, thinners, finishes, and related specialty products. On the southern half of the Site was located the Photo Products Plant, which manufactured photographic films and related specialty items, including a polyester film called Mylar®, made from the resin polyethylene terephthalate. Mylar®, which displayed superior strength, heat resistance, and insulating properties, opened new markets for DuPont in magnetic audio and video tape, packaging, and batteries.

63.   Beginning in or around 1975, DuPont began to manufacture polytetrafluoroethylene ("PTFE"), which requires PFOA as a processing aid, and marketed it under the trade name "Teflon." Until 2002, DuPont purchased the PFOA it required for its manufacturing activities from Defendant 3M.

64.   The Automotive Products Plant and the Photo Products Plant operated entirely independently of one another, with a fence erected across the middle of the Site, until 1986, when DuPont

consolidated the Plants, and the Site itself, under the management of the Imaging Systems Department.

65.    Around this same time, in late 1986 and early 1987, DuPont shut down its production of polyester products, and proceeded with decommissioning tank farms that stored polyester raw material and finished products.

66.    In 1990, DuPont phased out its paint thinner business, and the associated tank farms were emptied and decommissioned.

67.    By late 1991, DuPont had initiated a plant-wide dismantlement and removal of decommissioned tanks and associated support buildings.

68.    Since 1991, DuPont continues to modify operations, and manufactures products at the Site that include, but are not limited to, Cyrel®, flexographic printing plates used for the printing industry, fluoropolymer blending and repackaging, Teflon®, and electronic resins for the computer industry.

69.    In or around 2002, DuPont also began producing PFOA as a raw material for its own use and for sale, after 3M ceased PFOA production, as discussed in further detail, infra.

70.    In or around 2006, EPA initiated the 2010/2015 PFOA Stewardship Program, inviting eight chemical companies, all manufacturers of PFOA or of products using PFOA (including 3M and DuPont), to participate.  On January 25, 2006, DuPont agreed to commit to the Stewardship Program, and by way of this, agreed to,

by 2010, cut its facility emissions of PFOA and related chemicals and the content of these compounds in products by 95% from 2000 levels, and then work to eliminate the chemicals entirely from emissions and products by 2015.

71.     Soon after, in or around 2009, hexafluoropropylene oxide dimer acid ("HFPO-DA"), also commonly known as GenX, was developed as a replacement product for PFOA.  GenX will be discussed in further detail, infra.

72.     Upon information and belief, Chemours is operating on the Parlin Site as a tenant.

73.     On January 29, 2019, DuPont sold all or part of the Parlin Site to DuPont Specialty Products USA, LLC.

### PFAS COMPOUNDS & "GENX"

74.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.  PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.  The PFAS family of chemicals is entirely manmade and does not occur in nature.  PFOA and PFOS are among the most toxic chemicals in the PFAS family. PFOA and PFOS are the most widely studied PFAS chemicals, and have been shown to be toxic at very low concentrations.

75.     PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination.

Specifically, they are mobile and persistent.  They are mobile in that they are soluble and do not adsorb (stick) to soil particles, and are readily transported through the soil and into groundwater where they can migrate long distances.  They are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water.  In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air or water, those compounds migrate through the environment and into groundwater, resist natural degradation, and are difficult and costly to remove.

76.    PFOA and PFOS bioaccumulate, biopersist, and biomagnify in people and other organisms.

77.    Exposure to PFAS in both humans and animals, even in low quantities, has been linked to several diseases, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, and pregnancy-induced hypertension and low birth weight.

78.    PFOA and PFOS contamination presents a serious threat to public health through drinking water.  Humans can also be exposed through contaminated food, inhalation, and dermal contact.

79.    PFOA and PFOS enter the environment from industrial facilities that manufacture PFOA or PFOS, or that use PFOA, PFOS, or products that degrade to PFOA or PFOS in the manufacture or production of other products.  Releases to land and water from a

multitude of industrial sites are known pathways to the environment. PFOA and PFOS may also enter the environment when released from PFOA- or PFOS-containing consumer and commercial products during their use and disposal.

80.   Beginning in 2013, DuPont replaced its production and use of PFOA with "GenX" chemicals. GenX is the trade name for the chemicals, including HFPO-DA, that allow for the creation of fluoropolymers without PFOA. While DuPont, in a 2010 marketing brochure, touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure. Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable and mobile in the presence of water. DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent." EPA is currently in the process of publishing a toxicity assessment for GenX.

81.   In 2017, the Department accepted the New Jersey Drinking Water Institute's recommended health-based maximum contaminant level ("MCL") for drinking water of 14 ng/L or parts per trillion ("ppt") of PFOA, and updated its drinking water guidance value for PFOA to this level. The previous preliminary drinking water guidance level for PFOA issued by NJDEP in 2007 was

40 ppt.  In September 2018, the Department also established an MCL of 13 ppt for perfluorononanoic acid ("PFNA"), another member of the PFAS family of chemicals.  On March 13, 2019, the Department established interim specific groundwater quality criteria for PFOA of 10 ppt.   In addition, the Department has proposed rules establishing MCLs for PFOA of 14 ppt and for PFOS of 13 ppt, establishing groundwater quality criteria standards for PFOA of 14 ppt and PFOS of 13 ppt, and adding PFOA and PFOS to the Spill Act's List of Hazardous Substances.

### DUPONT'S USE AND MANUFACTURE OF PFAS

82.   Beginning in 1951, DuPont began purchasing PFOA from 3M for use in the manufacturing process for its name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.  DuPont has also used PFAS in other name-brand products such as Tyvek®.

83.   3M phased out production of PFOA in 2002.  As explained below, although DuPont was fully aware that PFOA was a dangerous and toxic chemical, it began producing its own PFOA for use in its manufacturing processes, including those at the Parlin Site.

### 3M COMPANY - MANUFACTURE & DISTRIBUTION OF PFAS

84.   Though the PFAS family of chemicals was first accidentally discovered by a DuPont scientist in 1938, for most of

the past several decades, 3M has been the primary manufacturer of PFOA and PFOS.

85.   3M began producing PFOA and PFOS as raw materials that they used to produce other products, or that they sold to third parties for use in other products. 3M produced PFOA and PFOS by electrochemical fluorination in the 1940s. This process results in a product that contains and/or breaks down into compounds containing PFOA and/or PFOS. 3M went on to market PFAS and products containing PFAS, and shipped PFOA and PFOS to manufacturers all over the country, including to DuPont which used PFOA and discharged it from the Parlin Site and other facilities.

## DEFENDANTS' KNOWLEDGE OF THE DANGERS OF PFAS

86.   By 1956, 3M's PFAS compounds were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

87.   3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

88.   DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats

and dogs.  DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

89.    As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

90.    By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

91.    By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.  One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

92.    In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this PFOA — a possibility that 3M considered internally but did not share outside the company.  This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

93.    As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS' health effects.

94.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.  In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.  DuPont was aware of 3M's findings no later than 1981.

95.     Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially-exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine. (As noted above, PFAS contain carbon and fluorine, and human exposure to these chemicals therefore has been linked to elevated organic fluorine levels.)

96.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.  A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

97.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS' environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk

assessment on PFOS and similar chemicals.  At the time of the specialist's resignation in 1999, that resistance had not ceased.

98.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.  DuPont did not report this data or the results of its worker health analysis to any government agency or community at this time.

99.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

100.    Not only did DuPont know that PFOA accumulated in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.  DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two - or 25% - had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

101.    In fact, DuPont reported to the EPA in March 1982 that results from a rat study showed PFOA crossing to the placenta if present in maternal blood, but DuPont concealed the results of the study of its own plant workers.

102.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of

26

contaminating the surrounding environment and causing human exposure.

103.   By late 1981, DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries.

104.   Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

105.   In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

106.   In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." That same year, 3M worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

107.   DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking water.  After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").  DuPont

employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

108.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in 3M's business, and that these departments had "no incentive to take any other position."

109.     Also in 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

110.     By at least 1993, Defendants were aware that PFAS were linked to increased cancer rates in humans exposed to their PFOA products.

111.     Despite its understanding of the hazards associated with its PFOA and PFOS products, 3M actively sought to suppress

scientific research on the hazards associated those products, and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and ecological risks of its PFOA and PFOS products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFCs] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

112. In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

113. DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public and that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, ERB "strongly

advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

114.   In 2004, EPA filed an action against DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the Toxic Substances Control Act and RCRA.  DuPont eventually settled the action by agreeing to pay over $16 million in civil administrative penalties and supplemental environmental projects.

115.   All Defendants knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment. This knowledge was accessible to all Defendants, but not fully to Plaintiffs.

## HISTORY OF INVESTIGATION, REGULATION, & REMEDIATION

116.   Between October 1986 and April 1987, a groundwater assessment was conducted to determine the potential impacts of waste handling and disposal practices upon groundwater quality beneath the Parlin Site.  The assessment consisted of a search of existing records and published literature, plant tours, and interviews with plant personnel.  No field investigations were conducted and no extensive observations of plan operations were made to verify records.

117.   During the course of this assessment, 60 Solid Waste Management Units ("SWMUs") were identified: 20 on the former Photo Products Plant property, and 40 on the former Automotive Products Plan property.

118.   Many SWMUs and areas of concern ("AOCs") require additional investigation and remediation, and little or no restoration work has been performed.  Examples are set forth below.

*Operation & Contamination History at the SWMUs*

119.   Building 713 was the site of all fluoropolymer blending and repackaging at the Site.  Containers (called "totes") holding 250 gallons each of a fluoropolymer aqueous dispersion which contained 0.15% to 1.1% PFOA were shipped to the Site from DuPont's location in Parkersburg, West Virginia, and stored in various areas of Building 713.  The employees would place the totes in the blending area, where the dispersion would be discharged from the tote into tanks where dilution water and additional ingredients were added, and then discharged into smaller containers.  These smaller containers were then stored and shipped to another destination.

120.   Located in the southeastern area of the Site, the Salvage Yard was dubbed S-1, and occupies approximately 2.5 acres. It was formerly used for operations of a drum wash, a liquid waste pit, open burning, open disposal of liquid and solid waste, and

storage of transformers, oil, and soil. Early investigations determined that PAHs, PCBs, and lead were released into soils at concentrations exceeding Non-Residential Direct Contact Soil Remediation Standards ("NRDCSRS").

121. Located in the eastern area of the Site, directly north of the Salvage Yard, the Tree Farm was labeled S-2. This area was approximately one acre in size, was covered by 20 to 30-foot deciduous trees, and between 1953 and 1954 was used for the spray application of silver recovery centrifuge wastes as a bio-treatment experiment. Historical data indicated that this was a source of metals to groundwater.

122. In the southwestern portion of the Site, the Seepage Pits, now dubbed S-5, are located beneath a partially paved area. Historically, this SWMU consisted of a series of shallow earthen pits, approximately seven feet deep each. These pits were used for the disposal of Latex®, triethylene glycol diacrylates, and scrap latexes generated by dye manufacturing processes. Investigations at this SWMU have revealed elevated levels of TCE and VOCs.

123. Also in the southwestern area of the Site, south of S-5, the Liquid Waste Pool, now named S-6, is located beneath a paved area. This SWMU was a commercially available, steel frame, plastic-lined recreational swimming pool that was used to temporarily store liquid wastes, which consisted of gelatin

mixtures, polyvinyl alcohol, latexes, and 1,1-dichloroethene. Investigations at this SWMU have revealed elevated levels of TCE and VOCs.

124.    In the eastern area of the Site, directly adjacent to the donated parcel of land, is located S-8, called the Landfill. Historically, this nine-acre parcel was used to manage waste at the Site from the mid-1920s through the early 1980s. Here, DuPont burned waste, rubble, and trash, including material such as brush, wood, trash, solvents, resins, lacquers, paint sludge, and paint filters. After burning, the residual material, ash, and containers used to store the chemical waste prior to burning, were disposed of in the Landfill. Other materials, including demolition rubble, lumber, garbage, bagged asbestos, glassware, off-spec paint, filters, paint cans, asphalt, and metal and ceramic debris, were disposed of in the Landfill as well. In the southwestern area of the Landfill, there was located a solvent evaporation pit, where, for an unknown period of time, the liquid contents of drums were poured into the pit and allowed to evaporate or percolate. Also disposed of in the Landfill area were telephone poles and railroad ties. Investigations have revealed levels of metals, including arsenic and lead, exceeding NRDCSRS thresholds, and recent studies have delineated areas with PCB contamination.

125.    Along the western boundary of the Site is S-9, known as the Lagoons. This SWMU consists of three, unlined lagoons

labeled A, B, and C.  In the 1950s, these unlined lagoons received aqueous wastes and wastewater derived from the production of nitrocellulose, resins, adhesives, plasticizers, and can and tank car wash operations.  At the height of their use, the average daily discharge rate to the Lagoons measured approximately 70,000 gallons, and the average biochemical oxygen demand ("BOD") of the effluent ranged from 50,000 to 88,000 parts per million ("ppm").  In 1953, DuPont constructed a pilot treatment plant, and reduced the effluent BOD to 3,000 ppm.  By 1960, DuPont had halted discharges to the Lagoons.  Investigations have revealed contaminants exceeding various soil thresholds including metals, PCBs, VOCs, and semi-volatile organic compounds ("SVOCs").  Additionally, groundwater under the lagoons exceeds water quality criteria for VOCs, PCBs, phthalates, and metals.

126.    Along the northwestern boundary of the Site is S-10, the Sludge Pile.  This SWMU was a low-lying area which was filled approximately 50 years ago with calcium sulfate sludge, a residue produced from the neutralization of acids used in the manufacture of nitrocellulose.  While the precise boundaries of the Sludge Piles are unknown, the estimated extent is approximately 4.5 acres, is currently used as a truck parking lot and driveway and may extend under buildings, walkways, and paved roadways.  Remedial investigations have found soils contaminated with arsenic, PCBs, VOCs, and phthalates exceeding NRDCSRS.  The groundwater at the

SWMU and in downgradient wells has been contaminated by elevated concentrations of metals, PCBs, VOCs, and SVOCs.

127.    Running northeast to southwest, and located between Lagoons A & B, is S-11, the Drainage Channel. Before the 1950s, DuPont discharged the bulk of industrial effluent from the Site into the open Drainage Channel, where the effluent flowed into the Second Brook, and ultimately reached the South River, a tributary of the Raritan River. Between 1915 and 1978, the Drainage Channel received several hundred thousand gallons per day of process cooling water, wash water, and floor drain collections. In recent years, though much of the ditch is covered, the Drainage Channel serves as a storm drain and has flow during periods of high precipitation. Additionally, some steam traps on the Site continue to discharge to the Drainage Channel. The soil and groundwater at the SWMU are contaminated with concentrations of metals, PCBs, VOCs, and SVOCs which exceed the NRDCSRS and Impact to Groundwater Soil Screening Levels ("IGWSSL").

128.    Located in the southwestern area of the Site, adjacent to the Lagoons, is S-15, the WSM Tank Farm. This SWMU is an inactive and dismantled tank farm, including tank areas 1878, 1891, and 1896. This area, which was bermed but not lined, was used for over 50 years to store primarily acetates, alcohols, and ketones. In 1986, a documented spill of 560 gallons of ethyl acetate occurred.

129.    Located somewhat central in the Site is S-16, the 711 Tank Farm.   Operations at this SWMU began in 1940, and 13 aboveground tanks were used primarily for the storage of alcohols, acrylates, ketones, esters, mineral spirits, and toluene.   Raw materials were unloaded from tanker trucks in a remote tank wagon unloading area.   In 1980, a spill of approximately 700 gallons of ethyl acrylate occurred, and in 1989, a leak of 4-methyl-2-pentanone occurred.

130.    Located in the northwestern area of the Site, directly to the east of the Sludge Pile, is S-17, the FOP Tank Farm.   This SWMU is an inactive tank farm, including Tank Areas 111, 99, 304, and 2001, and tank wagon loading and unloading areas.   This area, which was bermed but not lined, was used for over 50 years to store PCBs, fuel oil, solvents, intermediates and finished resin products, glycol, glycerin, alcohols, and ketones.   Groundwater under the SWMU exceeds water quality criteria for VOCs.

131.    Located in the western area of the Site inside S-10 is S-22, the Flint Spot Tank Area 1806.   This SWMU was two tank farms, the Flint Spot Section with four storage tanks used to store lacquer cement, resin, TCE, and aromatic solvents, and the Electronic Section with three storage tanks used to store methyl-2-pyrolidone, butyl acrylate, and acrylonitrile.

132.    Located east of WSM Tank Farm is V-4, the Thinners Tank Farm Area 1894.   This inactive tank farm consisted of 15 tanks

used to store paint thinners, petroleum distillates, raw material solvents, toluene, xylene, acetone, methyl ethyl ketone, and methyl isobutyl ketone.  In 1987, a spill of toluene occurred.

133.   All SWMUs listed above, and others at the Site not described above, must be investigated further to fully delineate the extent of remaining contamination and damage to the natural resources both on-Site and off-Site.

*Regulatory History*

134.   Between 1988 and 1990, DuPont conducted a Phase I RCRA Facility Investigation ("RFI") at ten SWMUs that had been identified as presenting high potential for environmental contamination.  The investigation was focused on evaluating the potential impacts on soil and groundwater.  The Phase I RFI involved the taking and analyzing of 205 soil samples and groundwater samples from 70 of the 88 monitoring wells on the Site.

135.   Soil quality: The Phase I testing revealed elevated levels of SVOCs, PAHs, VOCs, metals, and silver in the soils at the 10 SWMUs.

136.   Groundwater Quality: The Phase I testing revealed elevated levels of VOCs in the Deep Old Bridge and in the Shallow Old Bridge at concentrations in excess of Corrective Action Guidance Levels ("CAGLs").

*On-Site Contamination*

137.   Between 1991 and 1992, DuPont conducted a Phase II RFI at six additional SWMUs to further investigate site-wide groundwater contamination.   There was also additional investigation of the site-wide groundwater, and in several of the SWMUs targeted during Phase I.   The Phase II RFI resulted in a total of 108 subsurface soil samples, 13 surface soil samples, four surface water samples, and 46 groundwater samples being collected and analyzed.

138.   At the same time as the Phase II RFI, DuPont also simultaneously conducted voluntary investigations ("VI") of six areas not subject to RCRA Corrective Actions.   The VI resulted in a total of 16 subsurface soil samples, ten surface soil samples, and six groundwater samples being collected and analyzed.

139.   Based on the results of the testing conducted during the Phase II RFI and the VI, the Department requested further investigation of all SWMUs targeted in the RFI.

140.   In 1992, DuPont entered into a Memorandum of Agreement with the Department, under which DuPont would develop an initiative to remediate the high levels of VOCs detected in the groundwater, and to conduct remedial activities to reduce the sources of VOCs in the soil.

141.   In 1995, DuPont installed two bioventing systems to remediate VOCs found in soils at the WSM Tank Farm and the Thinner Tank Area.   These systems operated until 2000.

142.    Semiannual   groundwater   monitoring   at   the   Site commenced in the fall of 1993.   Nineteen wells were monitored for benzene   and   selected   chlorinated   VOCs   and   used   to   monitor   the groundwater pump and treat ("P&T") system and site-wide background water quality.   In 2003, the monitoring system was expanded to the Site perimeter.   As of 2010, there were 59 wells that are monitored semi-annually for select VOCs, arsenic, and nickel.

143.    On June 28, 1999, DuPont initiated the operation of a P&T  system  at  the  Site  to  help  remediate  on-site  groundwater contamination.   The initial intent of the P&T system was to contain the source areas of chlorinated VOCs to the groundwater.

144.    In   2002,   DuPont   conducted   a   Phase   III   Site Investigation  and  a  Baseline  Ecological  Evaluation,  to  further delineate  and  characterize  nineteen  SWMUs  and  AOCs  identified  by the Department.

145.    In March 2007, DuPont shut down the on-site P&T system due to a directive from the Department, which stated that water from the system was no longer approved to supplement the potable water demands at the Site.   In 2008, DuPont modified the system discharge and brought the P&T back online.   The modified system discharged  the  treated  groundwater  to  a  sump  connected  to  the publicly-owned treatment works operated by the Middlesex County Utilities Authority.

146.   In 2009, DuPont submitted an "Enhanced Groundwater Remedial Action Workplan" for installation of an enhanced groundwater P&T system, which was designed to capture groundwater that exceeds New Jersey Groundwater Class II-A ("GWIIA") standards and to return groundwater to the aquifer via rapid infiltration basins. In February 2012, the enhanced P&T system was brought online, but as of 2017 was not operating at its full capacity.

147.   In 2014, DuPont conducted a Phase IV Remedial Investigation.   The purpose of this Investigation was to address data gaps identified during Phase III and to further delineate contaminants of concern ("COCs") in soil and groundwater.

*Detection of PFOA*

148.   Starting in 2005, DuPont began testing groundwater samples to determine the extent of potential PFOA contamination. Groundwater samples collected in December of 2005 contained elevated PFOA concentrations in wells north (299 ppt), southwest (243 ppt), and southeast (4,740 ppt) of Building 713.

149.   Subsequent groundwater sampling in 2006-2008 demonstrated even higher concentrations (3,000-36,000 ppt) east and southeast of Building 713 in the interior portion of the site and into the donated land parcel on the eastern edge of the property.   In 2008, groundwater samples collected along the property boundary south of Building 713 contained PFOA concentrations ranging from 10-410 ppt.

150.    Groundwater samples collected between 2006 and 2008 offsite, within about 0.75 miles east or southeast of the donated land parcel, contained PFOA concentrations ranging from 10-72 ppt. One sampling location located about 1.1 miles due east of the eastern boundary of the donated land parcel had lower concentrations ranging from below detection limit to seven ppt PFOA in a sample collected in January 2007.

151.    Groundwater monitoring continued between 2010 and 2018 and PFOA concentrations measured at both on-Site and off-Site wells remained elevated but, in some cases, decreased.

152.    The Utility Service Affiliates (Perth Amboy) Inc., (a subsidiary of Middlesex Water Company), manages and operates the Perth Amboy water system, which is owned by the City of Perth Amboy, and which draws from the Old Bridge Aquifer at the Runyon Well Field in Old Bridge, approximately one and a half miles southeast of the Parlin Site.  In 2017, Utility Service Affiliates (Perth Amboy) Inc. reported a "highest level detected" PFOA concentration of 29 ppt.

153.    When groundwater cannot be used for its normal purpose due to contamination, the Department may require that it be designated a Classification Exception Area ("CEA").  Use of the groundwater is restricted thereby. October 2018 groundwater sampling within the CEA established at the Site, described in further detail, infra, as well as outside the CEA, demonstrated

elevated PFOA concentrations along the Parlin Site southern boundary (wells ranging from 40-400 or 400-4,000 ppt) and wells east of the Site boundary inside and south of the CEA, with PFOA concentrations ranging from 40-400 ppt.

154.    Testing at nine wells on-Site also showed detectable concentrations of GenX.

*Off-Site Groundwater Contamination*

155.    The Phase III Site Investigations indicated that there was a potential for the offsite migration of groundwater impacted by Site related constituents, primarily VOCs.

156.    As a result, the first off-Site groundwater investigations were conducted and it was determined that the plume of contamination the on-Site groundwater with VOCs had migrated off-Site and still contains elevated concentrations of several VOCs.

157.    Off-Site groundwater monitoring reports report that offsite groundwater contamination in the shallow zone has been delineated for VOCs, and similarly off-Site groundwater contamination in the deep zone has been largely delineated for VOCs.

158.    Presently, the remedial action taken for off-Site groundwater is proposed to be monitored natural attenuation ("MNA"), which allows natural biological, chemical, and physical processes to treat groundwater contaminants, and involves ongoing

monitoring to verify that these processes are effective.  However, testing is showing that the MNA is not proving to be effective, and will likely not be effective in the future, as concentrations of VOCs are not declining in all wells and, in some cases, concentrations of certain constituents, such as TCE, are actually increasing.  Furthermore, as PFAS compounds do not breakdown naturally, MNA would not be an effective treatment for that contamination.

*Classification Exception Area*

159.   On September 18, 2007, DuPont submitted a CEA proposal to the Department addressing on-site groundwater.  At that time, there was an existing CEA from 1997 covering a small area associated with an underground storage tank.  The 2007 Site-wide CEA encompassed the former area, thereby superseding the existing CEA.

160.   In 2011, the off-Site Remedial Action Work Plan presented a modified draft CEA that includes groundwater both on-Site and off-Site.  The draft CEA defined the boundaries of the groundwater plume where contamination exceeds New Jersey GWIIA standards, which extended approximately two miles downgradient and covered 1,468 acres.

161.   In August 2015, the Department approved the proposed CEA.  While the CEA includes ten contaminants, all of which are

VOCs, the CEA does not include all of the COCs at the Site, including but not limited to PFOA, GenX, and 1,4-dioxane.

162.   In 2005, the Department, Administrator, and DuPont entered into a Compensatory Restoration Administrative Consent Order ("CRACO").  The CRACO is not a bar to the claims asserted in this Complaint for reasons including, but not limited to, the following: DuPont has failed to comply with the CRACO, concealed the nature and extent of contamination at its facilities, has attempted to provide contaminated property to fulfill its obligations, additional injuries have been incurred, additional discharges have occurred since the CRACO became effective, and injuries to natural resources, including groundwater, have resulted from remedial action implementation.

*DuPont's and 3M's Actual Malice / Wanton and Willful Disregard*

163.   DuPont and 3M, as detailed above, committed acts and omissions with respect to PFOA and other PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.  Such conduct was performed to promote sales of their products, or to reduce or eliminate expenses they would otherwise have incurred to remove PFAS from their waste streams, despite the impacts on the Site, the State, and its citizens relating to contamination of groundwater, surface water, and other natural resources.

164.    Therefore, Plaintiffs are requesting an award of punitive damages for DuPont's and 3M's especially egregious or outrageous conduct and to discourage them from engaging in similar misconduct in the future.  Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

*The Fraudulent Spinoff of DuPont's Specialty Chemicals Business*

165.    DuPont and Chemours have very substantial liabilities due to their polluting activities.  DuPont's and Chemours' liabilities for PFOA and other PFAS contamination account for a very substantial portion of their environmental liabilities nationwide, and therefore affect their overall ability to satisfy their environmental liabilities for the Parlin Site.

166.    DuPont sought to insulate itself from billions of dollars of legacy pollution liabilities, especially those arising from PFOA and other PFAS contamination at chemical plants that it owned and operated throughout the country.  Upon information and belief, DuPont's potential cumulative liability related to PFOA and other PFAS is likely billions of dollars due to the persistence, mobility, bio-accumulative properties, and toxicity of these "forever" compounds, as well as DuPont's decades-long attempt to hide the dangers of PFAS from the public.

167.    For more than five decades, DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey,

West Virginia, and North Carolina. As alleged above, throughout this time, DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment, and that tens of thousands of people had been exposed to PFOA, including through public and private drinking water supplies, which DuPont had contaminated. Thus, DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFOA.

168. For example, in 1999, members of the Tennant family, who owned property impacted by PFOA-contamination adjacent to DuPont's Washington Works plant in Parkersburg, West Virginia, sued DuPont in West Virginia federal court.

169. DuPont's in-house counsel was very concerned about DuPont's exposure related to PFOA. In November 2000, one of DuPont's in-house counsel handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release

of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

170.   In 2005, after confidentially settling the <u>Tennant</u> case, DuPont agreed to pay $10.25 million to resolve eight counts brought by EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act.  That was the largest civil administrative penalty that EPA had ever obtained under a federal environmental statute. DuPont also was required to commit an additional $6.25 million to supplemental environmental projects.   <u>See</u> <u>https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental</u>.

171.   Also, in 2005, DuPont agreed to settle a class action lawsuit, which had been filed on behalf of 70,000 residents of Ohio and West Virginia who had been exposed to PFOA that DuPont had discharged from Washington Works for $343 million.  Under the terms of the settlement, DuPont agreed to fund a panel of scientists (the "Science Panel") to determine if any diseases were linked to PFOA exposure, to filter local water for as long as PFOA concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.  The settlement also provided that any class members who developed the linked diseases would be entitled to sue for

personal injury, and DuPont agreed not to contest the fact that exposure to PFOA could cause those diseases.

172.    After eight years, the Science Panel found several human diseases with "probable links" to PFOA exposure, including: high cholesterol; ulcerative colitis; pregnancy-induced hypertension; thyroid disease; testicular cancer; and kidney cancer.

173.    More than 3,500 personal injury claims were filed against DuPont in Ohio and West Virginia as part of the 2005 settlement. These claims were consolidated in the federal multidistrict litigation styled In Re: E.I. du Pont de Nemours and Company C-8 Personal Injury Litigation (MDL No. 2433) in the United States District Court for the Southern District of Ohio. Forty "bellwether" trials were scheduled to take place in 2015 and 2016.

174.    DuPont knew that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination at other sites throughout the country, including the Parlin Site, among others, and that its liability was likely billions of dollars.

175.    In addition to its PFOA and other PFAS liabilities, DuPont was facing very substantial environmental liabilities for its historic manufacturing and research operations throughout the country.

176.   DuPont sought to limit its environmental liability and protect its assets by engaging in a series of restructuring transactions, including a "spinoff" of its performance chemical business which included Teflon, i.e., one of the primary products that DuPont manufactured using PFOA and which led to widespread contamination throughout the country.

177.   Chemours Co. was incorporated on February 18, 2014 under the name "Performance Operations, LLC." On April 10, 2014, the company was renamed "The Chemours Company, LLC." On April 30, 2015, the company was converted from a limited liability company to a corporation with the name "The Chemours Company." Prior to July 1, 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

178.   On July 1, 2015, DuPont completed the spinoff of its performance chemicals business (the "Spinoff") through the creation of Chemours Co., which became a separate, publicly-traded entity.

179.   DuPont and Chemours Co. entered into a June 26, 2015 Separation Agreement to effectuate the Spinoff (the "Separation Agreement"). At the time of the Spinoff, the performance chemicals business consisted of DuPont's Titanium Technologies Chemical Solutions and Flourochemicals segment (collectively, the "Performance Chemicals Business").

180.   Pursuant to the Separation Agreement, DuPont agreed to transfer to Chemours Co. all businesses and assets related to

the Performance Chemicals Business, including 37 active chemical plants.  Upon information and belief, the Parlin Site was one of the 37 sites referenced in the Separation Agreement and one or more schedules to that Agreement.

181.  Prior to the Spinoff, DuPont completed a significant internal reorganization so that all the assets and liabilities (held by DuPont or its subsidiaries) that DuPont deemed to be part of the Performance Chemicals Business would be held by Chemours Co., as a wholly owned subsidiary of DuPont.

182.  In addition to the assets transferred to Chemours Co., DuPont caused Chemours Co. to assume DuPont's historical liabilities relating to DuPont's Performance Chemicals Business, including those arising from its discharge of contaminants, such as PFOA and other PFAS, into the environment.  While specific details about the liabilities are set forth in non-public schedules that are not available to Plaintiffs, the Separation Agreement required Chemours Co. to assume what the agreement defines as "Chemours Liabilities," which include DuPont's historic liabilities regardless of (i) when or where such liabilities arose, (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Spinoff, (iii) where or against whom such liabilities are asserted or determined, (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud,

misrepresentation by DuPont or Chemours Co., or (v) which entity is named in any action associated with any liability.

183.   The Separation Agreement defines Chemours Liabilities broadly, to include "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities. . . .," which include DuPont's historic liabilities relating to and arising from its decades of emitting PFOA and PFAS along with other contaminants into the environment in New Jersey and elsewhere.

184.   Chemours Co. also agreed to indemnify DuPont in connection with those liabilities that it assumed.  The indemnification has no cap or temporal limitation.

185.   Chemours Co. also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

186.   Upon information and belief, there was no meaningful negotiation of the Separation Agreement, and DuPont largely dictated its terms.  Indeed, when the Separation Agreement was signed, Chemours Co. was a wholly-owned subsidiary of DuPont, and a majority of the Chemours Co. board consisted of DuPont employees.

187.    In connection with the Spinoff, Chemours Co. paid DuPont approximately $3.9 billion, consisting of approximately $3.4 billion in cash, plus approximately $507 million in promissory notes.  Chemours Co. also transferred all of its stock to DuPont, which was ultimately delivered to DuPont's shareholders.

188.    Chemours Co. was thinly capitalized following the Spinoff.  Indeed, shortly after the Spinoff, market analysts described Chemours Co. as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

189.    In order to fund the $3.9 billion payment to DuPont, Chemours Co. issued unsecured senior notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities, incurring a total of $4 billion in indebtedness.  Upon information and belief, the terms of the financing were dictated by DuPont, in its sole discretion, and not Chemours Co.

190.    According to Chemours Co.'s unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Spinoff), Chemours Co. had total assets of $6.4 billion and total liabilities of $6.3 billion. Following the Spinoff, Chemours Co. issued a 10-K stating that, as of December 31, 2015, Chemours Co. had assets totaling $6.3 billion and total liabilities of $6.2 billion.

191.    The 10-K stated that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation.  The 10-K also stated Chemours Co. had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

192.    However, Chemours Co. significantly underestimated its liabilities, especially the liabilities that it had assumed from DuPont with respect to  PFOA and other PFAS contamination, which DuPont and Chemours Co. should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at DuPont and Chemours facilities.

193.    For example, in 2017, Chemours Co. and DuPont amended the Separation Agreement in connection with the settlement of the personal injury multi-district litigation brought by thousands of residents who had been exposed to PFOA from DuPont's Washington Works plant.  Per the amendment, Chemours Co. paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and DuPont paid an additional $320.35 million on September 1, 2017.  For all future PFOA costs incurred from July 6, 2017 through July 6, 2022, Chemours Co. agreed to cover the first $25 million per 12-month period, DuPont agreed to cover the next $25 million per 12-month period, and Chemours Co. agreed to cover any additional amounts.

Chemours Co. is a named defendant in numerous lawsuits relating to DuPont's historical use of PFAS and other contaminants.

194.   Had Chemours Co. taken the full extent of these liabilities into account, as it should have done, it would have negative equity (that is, liabilities that are greater than assets), and would be balance sheet insolvent.

## First Count

### Spill Act
### (As Against All Defendants)

195.   Plaintiffs repeat each allegation of Paragraphs 1 through 194 above as though fully set forth in its entirety herein.

196.   Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

197.   The discharge of hazardous substances is prohibited. N.J.S.A. 58:10-23.11c.

198.   Many of the COCs at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

199.   The Department has submitted a notice of rule proposal to add PFOA to the Department's List of Hazardous Substances at N.J.A.C. 7:1E-Appendix A, which upon adoption will result in PFOA becoming a hazardous substance.

200.   Except as otherwise provided in N.J.S.A. 58:10-23.11g(12), which is not applicable here, any person who discharges a hazardous substance, or is in any way responsible for any

hazardous substance, shall be liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. 58:10-23.11g(c).

201.   The Department and Administrator have incurred, and will continue to incur, costs and damages, including lost use and value, costs of restoration and replacement for natural resources of this State that have been, or may be, injured as a result of discharges at the Parlin Site, and assessment costs.

202.   The costs and damages the Department and Administrator have incurred, and will incur, associated with discharges at the Parlin Site, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

203.   The DuPont Defendants, as dischargers of hazardous substances at the Parlin Site, are liable, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost use or value and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the Parlin Site. N.J.S.A. 58:10-23.11g(c)(1).

204.   The DuPont Defendants, as owners and/or operators of the Parlin Site at the time hazardous substances were discharged there, also are persons in any way responsible, and are liable,

jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost use or value and assessment costs, the Department and Administrator have incurred, and will incur, to assess, mitigate, restore, or replace any natural resource of this State that has been, or may be, injured as a result of the discharge of hazardous substances at the Parlin Site. N.J.S.A. 58:10-23.11g(c)(1).

205.  Defendant 3M, as the manufacturer, distributor, and/or seller of a proposed hazardous substance at the Parlin Site, will be a person in any way responsible, and will be liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement, assessment costs, that the Department and the Administrator have incurred, and will incur, to assess, mitigate, restore or replace, any natural resource of this State that has been, or may be, injured as a result of the discharge of the hazardous substance at the Parlin Site. N.J.S.A. 58:10-23.11g(c)(1).

206.  Pursuant to N.J.S.A. 58:10-23.11u(a)(1)(a) and N.J.S.A. 58:10-23.11u(b), the Department may bring an action in the Superior Court for, inter alia, injunctive relief, N.J.S.A. 58:10-23.11u(b)(1); for its unreimbursed investigation, cleanup and removal costs, including the costs of preparing and successfully litigating the action, N.J.S.A. 58:10-23.11u(b)(2);

for natural resource restoration and replacement costs, N.J.S.A. 58:10-23.11u(b)(4); and for any other unreimbursed costs or damages the Department incurs under the Spill Act, N.J.S.A. 58:10-23.11u(b)(5).

207.   Pursuant to N.J.S.A. 58:10-23.11g(a) and (b), the Defendants are also liable for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge.

208.   As a direct or indirect result of such violations set forth above, the Department and Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

a.   the investigation, cleanup, and removal of discharged hazardous substances;

b.   the restoration of natural resources contaminated by discharges of hazardous substances at the Parlin Site;

c.   the compensation of the citizens of New Jersey for the lost interim value and benefits of natural resources contaminated by discharges of hazardous substances at the Parlin Site; and

d.   the institution of corrective measures including monitoring of all impacted and potentially impacted public and private drinking water supplies for the

presence of hazardous substances, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

209.   The costs and damages the Department and Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

210.   Pursuant to N.J.S.A. 58:10-23.11q, the Administrator is authorized to bring an action in the Superior Court for any unreimbursed costs or damages paid from the Spill Fund.

## PRAYER FOR RELIEF

**WHEREFORE**, the Department and the Administrator request that this Court enter judgment against Defendants as follows:

a.   Ordering each Defendant to reimburse the Department and Administrator, jointly and severally, without regard to fault, for all cleanup and removal costs and direct and indirect damages they have incurred, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the Parlin Site, with applicable interest, and assessment costs;

b.  Finding each Defendant liable, jointly and severally, without regard to fault, for all future cleanup and removal costs and direct and indirect damages, including lost use and value, costs of restoration and replacement for any natural resource of this State injured as a result of the discharge of hazardous substances at the Parlin Site, with applicable interest, and assessment costs;

c.  Compelling each Defendant, jointly and severally, without regard to fault, to perform any further cleanup of the Parlin Site and off-site in conformance with the Site Remediation Reform Act, N.J.S.A. 58:10C-1 to -29, and all other applicable laws and regulations;

d.  Compelling each Defendant, jointly and severally, without regard to fault, to fund the Department's performance of an assessment of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at the Parlin Site, and compelling each Defendant to compensate the citizens of New Jersey for the costs of restoration and replacement and lost use and value of any injured natural resource;

e.  Ordering the Defendants to pay for all compensatory damages for the lost interim value of the natural

resources at and around the Parlin Site as a result of the contamination of such natural resources by hazardous substances;

f.  Finding each Defendant liable, jointly and severally, without regard to fault, for lost income due to damage to natural resources destroyed or damaged by a discharge, and loss of State tax revenue due to damage to real or personal property proximately resulting from a discharge;

g.  Awarding the Department and Administrator their costs and fees in this action pursuant to N.J.S.A. 58:10-23.11u(b)(2); and

h.  Awarding the Department and Administrator interest and such other relief as this Court deems appropriate.

### Second Count

### Water Pollution Control Act
### (Against the DuPont Defendants)

211.  Plaintiffs repeat each allegation of Paragraphs 1 through 210 above as though fully set forth in its entirety herein.

212.  The DuPont Defendants are each a "person" within the meaning of N.J.S.A. 58:10A-3.

213.  Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6(d) and (p), which are not applicable here, it is unlawful for any person to discharge any pollutant except to the extent the

discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by the Commissioner pursuant to the WPCA, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to - 1387. N.J.S.A. 58:10A-6(a).

214.   The unauthorized discharge of pollutants is a violation of the WPCA for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6(a).

215.   The Department has incurred, or will continue to incur, costs as a result of the discharge of pollutants at the Parlin Site.

216.   The Department also has incurred, and will continue to incur, costs and damages, including the costs of investigation to establish a violation at the Parlin Site, costs in removing, correcting, or terminating the adverse effects upon water quality or public health due to violations at the Parlin Site, and compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the Parlin Site.

217.   The DuPont Defendants discharged pollutants at the Parlin Site, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6(a), nor exempted pursuant to N.J.S.A. 58:10A-

6(d) or N.J.S.A. 58:10A-6(p), and are liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the discharge of pollutants at the Parlin Site.

218.    The costs and damages the Department has incurred, and will incur, for the Parlin Site are recoverable within the meaning of N.J.S.A. 58:10A-10(c)(2)-(4).

219.    Pursuant to N.J.S.A. 58:10A-10(c), the Commissioner may bring an action in the Superior Court for injunctive relief, N.J.S.A. 58:10A-10(c)(1); for the costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, N.J.S.A. 58:10A-10(c)(2); any cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, N.J.S.A. 58:10A-10(c)(3); compensatory damages and any other actual damages for any natural resource of this State that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, N.J.S.A. 58:10A-10(c)(4); and the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation,

the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, N.J.S.A. 58:10A-10(c)(5).

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Commissioner requests that this Court enter an order granting judgment against the DuPont Defendants, jointly and severally, and without regard to fault:

a.  Permanently enjoining the DuPont Defendants, requiring them to remove, correct, or terminate the adverse effects on water quality resulting from any unauthorized discharge of pollutants at or from the Parlin Site;

b.  Assessing the DuPont Defendants, without regard to fault, for the costs for any investigation, inspection, or monitoring survey, leading to establishment of the violation, including the costs of preparing and litigating the case;

c.  Finding the DuPont Defendants liable, without regard to fault, for all costs for removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants at the Parlin Site;

d.  Finding the DuPont Defendants liable, without regard to fault, for all compensatory damages and other actual

damages for any natural resource of the State that has been, or may be, injured, lost, or destroyed as a result of the unauthorized discharge of pollutants at the Parlin Site;

e.     Finding the DuPont Defendants liable, without regard to fault, the for amount of any economic benefits they have accrued, including any savings realized from avoided capital or noncapital costs, the return they have earned of the amount of avoided costs, and benefits each Defendant has enjoyed as a result of a competitive market advantage, or any other benefit they have received as a result of having violated the WPCA;

f.     Awarding the Commissioner her costs and fees in this action pursuant to N.J.S.A. 58:10A-49.1(c)(2);  and

g.     Awarding the Commissioner interest and such other relief as the Court deems appropriate.

### Third Count

### Industrial Site Recovery Act
### (AS AGAINST DUPONT)

220.    Plaintiffs repeat each allegation of Paragraphs 1 through 219 above as though fully set forth in its entirety herein.

221.    The purpose of ISRA to ensure that any property meeting the definition of an "industrial establishment" will be investigated for potential environmental impacts and, if

warranted, remediated in accordance with the Department regulatory requirements if and when the establishment, or the entity that owns or operates an establishment, either closes the operations of the establishment or transfers the establishment's ownership or operations. N.J.S.A. 13:1K-7. A principal goal of ISRA, as stated in its Legislative Findings and Declarations section, is to ensure that "funding for the cleanup [of industrial establishments] is set aside at the time it is available from a transfer or closing" to ensure "contaminated property is not abandoned to the State for cleanup." Id.

222. An "industrial establishment" is defined by Department regulation as "any place of business or real property at which such business is conducted" that falls within a range of North American Industry Classification System ("NAICS") codes listed in Appendix C to N.J.A.C. 7:26B-1.1 to -8.2, whereon operations were conducted on or after December 31, 1983, involving the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances and wastes on-site, above or below ground, unless otherwise provided at N.J.A.C. 7:26B-2.1. N.J.A.C. 7:26B-1.4.

223. For any ISRA-applicable transfer of ownership or operations of an industrial establishment, the owner or operator of the industrial establishment that is the subject of the transfer is required to file a General Information Notice with the

Department within five days after (1) the execution of an agreement to transfer ownership or operations or (2) closing operations of or its public release of its decision to close operation, whichever occurs first.  N.J.S.A. 13:1K-9(a).

224.  For any ISRA-applicable transfer of ownership or operations of an industrial establishment, except in limited circumstances not relevant here, the owner or operator of the industrial establishment that is the subject of the transfer also is required, prior to the transfer, to establish ISRA compliance either by obtaining Department approval of one of several forms as set forth at N.J.A.C. Sections 7:26B-5.3 through 5.9 or by filing a completed Remediation Certification as defined pursuant to N.J.A.C. 7:26B-3.3 (collectively, "ISRA Compliance").

225.  If the form of ISRA Compliance is a Remediation Certificate, the transferring party must also establish a Remediation Funding Source ("RFS") prior to the transfer in accordance with applicable requirements in the Department's Administrative Requirements for the Remediation of Contaminated Sites ("ARRCS") at N.J.A.C. 7:26C-5.1 to -5.13.

226.  The Parlin Site is a chemical manufacturing facility and, as such, falls within either or both NAICS Codes 325 and 326, both of which are within the range of ISRA-applicable NAICS codes. Id.

227.   On or after December 31, 1983, DuPont engaged in operations involving the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances (as defined under N.J.S.A. 13:1K-8) and wastes on-site, above or below ground, at the Parlin Site.

228.   The Parlin Site is an "industrial establishment" within the meaning of ISRA.

229.   On or about December 18, 2014, DuPont filed a Registration Statement with the U.S. Securities Exchange Commission ("SEC") announcing its intention to transfer stock and assets associated with its Performance Chemicals Business to Chemours Co.

230.   The planned transfer of stock and assets to Chemours Co., as announced and described in DuPont's December 18, 2014, Registration Statement to the SEC (the "SEC Announcement"), constituted a "change of ownership" and a "transferring of ownership or operations" of the Parlin Site, an industrial establishment, within the meaning of ISRA, that would result in the transfer of more than 10% of DuPont's assets available for remediation of the Parlin Site. N.J.S.A. 13:1K-8. As such, the SEC Announcement triggered an obligation for DuPont to file a General Information Notice, as defined under N.J.S.A. 13:1K-8, with the Department notifying it of the planned transaction.

231.   DuPont failed to file a General Information Notice with the Department notifying of the pending transfer of ownership or operations of the Parlin Site to Chemours within five days of the SEC Announcement, thereby violating ISRA.

232.   On or about June 26, 2015, DuPont initiated and later completed a series of transactions involving the sale of stock or assets, or both, to Chemours Co. (the "Chemours Spinoff"), which transaction constituted a "change of ownership" and a "transferring of ownership or operations" of the Parlin Site, an industrial establishment, within the meaning of ISRA, that would result in the transfer of more than 10% of DuPont's assets available for remediation of the Parlin Site. N.J.S.A. 13:1K-8.

233.   By its actions initiating and completing the Chemours Spinoff, including its execution of the Separation Agreement, without having obtained the Department's approval pursuant to N.J.A.C. Section 7:26B-5.3 through 5.9 or without having first filed a Remediation Certification and establishing an RFS, DuPont violated ISRA and has continued to violate ISRA each day that it has failed to do so.

234.   By deed dated January 29, 2019, DuPont transferred the ownership of the Parlin Site to DuPont Specialty Products USA, LLC, which transfer was a "change in ownership" as defined in ISRA, which transfer was prohibited pursuant to ISRA without DuPont's first submitting a General Information Notice to the Department,

obtaining ISRA Compliance from the Department, and establishing an RFS.

235.   DuPont's January 29, 2019 transfer of a deed to DuPont Specialty Products USA, LLC for the Parlin Site without having previously filed a General Information Notice with the NJDEP, obtaining an ISRA Compliance, and establishing an RFS, constitutes a separate and individual violation of ISRA, which DuPont has failed to cure to this day.

236.   As a direct or indirect result of the foregoing violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to the investigation, cleanup, and removal of discharged hazardous substances, and the State of New Jersey has been thwarted in its right, pursuant to ISRA, to obtain the financial assurance necessary to ensure that all hazardous substances and pollutants at and emanating from the Parlin Site will be remediated up in accordance with ISRA and the Department's regulatory requirements.

237.   Pursuant to N.J.S.A. 13:1K-13.1, the Commissioner is authorized to bring an action in the Superior Court for relief for each day of each violation of ISRA, as well as for other relief, which the Court may grant in a summary proceeding, to enforce the provisions of ISRA and to prohibit or to prevent the violation of ISRA or of any rule or regulation adopted pursuant ISRA.   As

further provided pursuant to N.J.S.A. 13:1K-13.1, such relief may include assessment of the violator for the costs of any inspection that led to the establishment of the violation, and for the reasonable costs of preparing and litigating a claim seeking the enforcement of its ISRA obligations.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commissioner requests that this Court enter judgment against the DuPont as follows:

a.  Ordering DuPont to fully comply with ISRA by, _inter alia_, the submission of a Remediation Certification and establishment of a Remediation Funding Source for the Parlin Site in conformance with N.J.A.C. 7:26C-5.1 to -5.13.

b.  Ordering DuPont to reimburse the Department and Administrator for the costs of preparing and litigating its claim seeking the enforcement of DuPont's ISRA obligations; and

c.  Awarding the Commissioner such other relief as this Court deems appropriate.

## Fourth Count

### Brownfield and Contaminated Site Remediation Act
### (As Against the DuPont Defendants)

238.   Plaintiffs repeat each allegation of Paragraphs 1 through 237 above as though fully set forth in its entirety herein.

239.   The DuPont Defendants are each a "person" within the meaning of N.J.S.A. 58:10-23.11b and N.J.S.A 58:10B-1.

240.   Many of the contaminants of concern at the Site are hazardous substances as defined in N.J.S.A. 58:10-23.11b.

241.   The DuPont Defendants are "dischargers" of hazardous substances at the Site and/or are each a "person in any way responsible," pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, for any hazardous substance that was discharged at the Site, as either an "owner of the real property where the discharge occurred at the time of the discharge" or a "subsequent owner of the real property where the discharge occurred prior to the filing of a final remediation document with the Department."  N.J.A.C. 7:26C-1.4.

242.   Pursuant to Section 58:10B-1.3 of the Brownfields Act, as the discharger of hazardous substances at the Site or a person in any way responsible for a hazardous substance pursuant to N.J.S.A. 58:10-23.11g, the DuPont Defendants are affirmatively obligated to remediate the discharged hazardous substances at the Site.

243.   Pursuant to Section 58:10B-358:10B-1.3 of the Brownfields Act, as the discharger of hazardous substances at the Site or a person in any way responsible for a hazardous substance, the DuPont Defendants are required to establish RFS in an amount necessary to pay the cost to remediate.

244.     Pursuant to N.J.A.C. 7:26C-1.4, the DuPont Defendants are required to comply with the Department's ARRCS rules because each is a "person in any way responsible," pursuant to the Spill Act.

245.     Pursuant to the Department's Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1.3 and 7:26E-1.5(a) (the "Technical Requirements"), as persons subject to the requirements of the ARRCS rules, the DuPont Defendants are required to conduct a remediation of contaminants discharged at the Site in accordance with the Technical Requirements.

246. Pursuant to N.J.A.C. 7:26E-4.3(a)(4), 7:26E-5.1(b) and 7:26E-5.1(d)(1) and (4) of the Technical Requirements, DuPont, Chemours Co., and Chemours FC are required to, _inter alia_, (1) delineate the horizontal and vertical extent of all groundwater contamination to the groundwater remediation standard, and (2) remediate such contaminants in a manner that is "protective of public safety, health and the environment" and "complies with all applicable remediation standards."

247.     On March 13, 2019, the Department established interim specific groundwater quality standards for PFOA and PFOS of 0.01 ug/L (10 ng/L). The interim specific groundwater quality standards for PFOA and PFOS thereafter became effective upon posting to the "Table of Interim Specific Groundwater Quality Criteria (ISGWQC), Interim PQLs (IPQLs), and Interim Specific Groundwater Quality

Standards (ISGWQS) for Constituents in Class II-A Groundwater" on the NJDEP website at https://www.nj.gov/dep/wms/bears/gwqs.htm. The DuPont Defendants are therefore required to investigate and remediate PFOA and PFOS to the foregoing standards and to post an RFS in connection with the same.

248. As a direct or indirect result of the foregoing violations, the Department and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to the investigation, cleanup, and removal of discharged constituents and other materials, and NJDEP has been thwarted in its right pursuant to the Brownfields Act to obtain the financial assurance necessary to ensure that all hazardous substances at and emanating from the Site will be cleaned up in accordance with the Brownfields Act and NJDEP's regulatory requirements.

## PRAYER FOR RELIEF

**WHEREFORE,** the Department and the Administrator request that this Court enter judgment against the DuPont Defendants as follows:

a. Ordering DuPont, Chemours Co., and Chemours FC to, jointly and severally, fully comply with the Brownfields Act by, _inter alia_, the submission of a remedial investigation workplan and remedial investigation report pertaining to all off-site locations at which pollutants, contaminants and/or hazardous substances

originating from the Site have come to be located, and the establishment of a RFS for the Parlin Site in conformance with N.J.A.C. 7:26C-5.1 to -5.13;

b.    Ordering the DuPont Defendants, jointly and severally, to reimburse the Department and Administrator for the reasonable costs of preparing and litigating their claim seeking the enforcement of the DuPont Defendants' obligations pursuant to the Brownfields Act; and

c.    Awarding the Department and the Administrator such other relief as this Court deems appropriate.

## Fifth Count

### Solid Waste Management Act
### (As Against the DuPont Defendants)

249. Plaintiffs repeat each allegation of Paragraphs 1 through 248 above as though fully set forth in its entirety herein.

250. The DuPont Defendants are each a "person" within the meaning of N.J.S.A. 13:1E-3.

251. The Solid Waste Management Act ("SWMA" or the "Act") defines "[s]olid waste" as, inter alia, "discarded materials resulting from industrial, commercial and agricultural operations" and "all other waste materials." N.J.S.A. 13:1E-3.  N.J.A.C. 7:26-1.6(b) defines "other waste material," in pertinent part, as "any solid, liquid, semi-solid or contained gaseous material, including, but not limited to spent material, sludge, by-product,

74

discarded commercial chemical products, or scrap metal resulting from industrial, commercial, mining or agricultural operations, from community activities, or any other material which has served or can no longer serve its original intended use, which . . . [i]s discarded or intended to be discarded . . . [i]s applied to the land or placed on the land or contained in a product that is applied to or placed on the land in a manner constituting disposal." N.J.A.C. 7:26-1.6(b) provides that "a material is also a solid waste if it is 'disposed of' by being discharged, deposited, injected, dumped, spilled, leaked or placed into or on any land or water so that such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or surface waters."

252. N.J.S.A. 13:1E-3 of the SWMA and N.J.A.C. 7:26-1.4 define "disposal" as "the storage, treatment, utilization, processing, resource recovery of, or the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid or hazardous waste into or on any land or water, so that the solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters."

253. Various constituents present in soils, groundwater, and surface water in and around the Site, including PFAS-related

chemicals, are discarded materials and are "solid waste" as defined under N.J.S.A. 13:1E-3 and N.J.A.C. 7:26-1.6.

254. The DuPont Defendants have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and around the Site in the form of various constituents, including PFAS-related chemicals, without first having filed a completed application for and received approval of a solid waste facility ("SWF") permit for such activities, resulting in the widespread presence of such solid wastes in soils, groundwater, and surface water in and around the Site, all in violation of N.J.A.C. 7:26-2.8(e).

255. The DuPont Defendants have engaged in the past disposal, and/or are continuing to engage in the disposal, of solid waste in and/or around the Site in the form of hazardous constituents, including PFAS-related chemicals, in excess of 0.148 cubic yards of solids and/or 30 gallons of liquids, at locations other than a permitted SWF, resulting in the widespread presence of such solid wastes in soils, groundwater and surface water in and around the Site, in violation of N.J.S.A. 13:1E-9.3.

256. Pursuant to N.J.S.A. 13:1E-9(b) and (d), when the Commissioner finds that a person has violated any provision of the SWMA or any regulations adopted pursuant to the SWMA, the Commissioner is authorized to bring a civil action in Superior Court seeking temporary or permanent injunctive and other relief,

as well as assessment of the violator for the costs of any investigation leading to the establishment of the violation, costs incurred by the State in removing, correcting, or terminating the adverse effects to water and air quality resulting from the violation, and assessment against the violator of compensatory damages for any loss or destruction of wildlife, fish or aquatic life, and for any other actual damages, all of which relief may be awarded in a summary manner.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commissioner requests that this Court enter judgment against the DuPont Defendants as follows:

a.  Ordering DuPont, Chemours Co., and Chemours FC to, jointly and severally, fully comply with the SWMA by, inter alia, removing all unlawfully disposed of solid waste, including PFAS-related chemicals, from all locations in and around the Site at which the same have come to be located and for which DuPont, Chemours Co., and Chemours FC did not obtain a SWF permit;

b.  Ordering DuPont, Chemours Co., and Chemours FC, jointly and severally, to reimburse the Commissioner for the reasonable costs of preparing and litigating her claim seeking the enforcement of DuPont's, Chemours Co.'s, and Chemours FC's obligations pursuant to the SWMA;

c.  Ordering DuPont, Chemours Co., and Chemours FC, jointly and severally, to reimburse the Commissioner for the cost incurred by the Department in assessing, removing, correcting, or terminating the adverse effects upon water and air quality resulting from their violations of the SWMA;

d.  Ordering DuPont, Chemours Co., and Chemours FC, jointly and severally, to compensate the State for the loss or destruction of wildlife, fish or aquatic life, and other actual damages caused by their violations of the SWMA; and

e.  Awarding the Commissioner such other relief as this Court deems appropriate.

## Sixth Count

### Public Nuisance
### (Against the DuPont Defendants)

257. Plaintiffs repeat each allegation of Paragraphs 1 through 256 above as though fully set forth in its entirety herein.

258. Groundwater, surface water, sediments, wetlands, soils, air, and biota are natural resources of the State held in trust by the State.

259. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

260. The contamination of the groundwater, surface water, sediment, wetlands, soils, air, and biota at and around the Parlin Site constitutes a physical invasion of the State's natural resources, and upon information and belief, the State's real property in the vicinity of the Parlin Site, and an unreasonable and substantial interference, both actual and potential, with (1) the exercise of the public's common right to these natural resources; (2) the State's special property and statutory status and obligations regarding the natural resources of the State; (3) the State's ability, through the Department, to protect, conserve and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (4) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

261. Upon information and belief, real property owned by the State has become contaminated by the Parlin Site, and therefore, the Department has suffered a special injury different from that common to the general public.

262. As long as these natural resources at and around the Parlin Site remain contaminated due to the DuPont Defendants' conduct, the public nuisance continues.

263. Until these natural resources are restored to their pre-injury quality, the DuPont Defendants are liable for the creation,

and continued maintenance, of a public nuisance in contravention of the public's common right to clean natural resources.

264. The Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

### PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs request that this Court enter judgment against the DuPont Defendants as follows:

a. Ordering the DuPont Defendants to reimburse the Department and Administrator for their costs of abatement, without regard to fault, including but not limited to all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that such natural resources are restored to their original condition;

b. Compelling the DuPont Defendants to abate the nuisance by investigating, cleaning up, restoring, treating, monitoring, and otherwise responding to contamination in the State's natural resources so that such natural resources are restored to their original condition;

c. Compelling the DuPont Defendants to pay special damages to Plaintiffs, funding the Department's performance of any further assessment and compensatory restoration of

any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances and pollutants at the Parlin Site, and compelling the DuPont Defendants to compensate the citizens of New Jersey, for the costs of restoration and replacement, including lost use and value of any injured natural resource;

d.  Ordering the Defendants to pay for all compensatory damages for the lost interim value of the natural resources at and around the Parlin Site as a result of the contamination of such natural resources by pollutants and hazardous substances;

e.  Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

f.  Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

g.  Awarding Plaintiffs such other relief as this Court deems proper.

### Seventh Count

**Trespass**
**(As Against the DuPont Defendants)**

265. Plaintiffs repeat each allegation of Paragraphs 1 through 264 above as though fully set forth in its entirety herein.

266. Groundwater, surface water, sediment, wetlands, soils, air, and biota are natural resources of the State held in trust by the State for the benefit of the public. Water resources are owned by the State for the benefit of its citizens.

267. The State brings this claim in both its public trustee and parens patriae capacities.

268. As the trustee over the State's natural resources, the State has a duty to protect and restore all natural resources of the State and protect the health and comfort of its inhabitants.

269. In its parens patriae capacity, the State may protect its "quasi-sovereign" interests, including the State's interest in the well-being of its populace, as well as the populace's interest in the integrity of the State's natural resources. Accordingly, the State is bringing this action for the invasion of its residents' possessory interests in the State's natural resources, because the harm to such interests is too widespread for any individual residents to seek relief themselves. Waters, sediments, air, and biota that have been affected by the DuPont Defendant's contamination are mobile, moving to and inhabiting areas far from the immediate area of the initial contamination.

270. Additionally, the State is the owner of lands in the vicinity of the Parlin Site.

271. The hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, air, and

biota at and around the Parlin Site, including on State-owned lands, constitute a physical invasion of property without permission or license, as well as further removed from the Parlin Site.

272. The DuPont Defendants are liable for trespass, and continued trespass, because the hazardous substances and pollutants in the groundwater, surface water, sediment, wetlands, soils, air, and biota at and around the Parlin Site, as well as contamination previously removed from the Parlin Site, resulted from discharges of hazardous substances and pollutants at the Parlin Site.

273. As long as the natural resources remain contaminated due to the DuPont Defendants' conduct, the trespass continues.

274. The DuPont Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against the DuPont Defendants as follows:

a. Finding the DuPont Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's natural resources so that

such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by hazardous substances and pollutants, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

    i.  Past and future testing of natural resources likely to have been contaminated by hazardous substances or pollutants;

    ii.  Past and future treatment of all natural resources containing detectable levels of hazardous substances or pollutants restored to non-detectable levels; and

    iii. Past and future monitoring of the State's natural resources to detect the presence of hazardous substances or pollutants, and restoration of such natural resources to their pre-discharge condition;

b.  Ordering the DuPont Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's natural resources;

c.   Ordering the DuPont Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the contamination;

d.   Ordering the DuPont Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the contamination of such natural resources;

e.   Ordering the DuPont Defendants to pay for all other damages sustained by Plaintiffs in their public trustee, <u>parens patriae</u>, and regulatory capacities as a direct and proximate result of the DuPont Defendants acts and omissions alleged herein;

f.   Entering an order against the DuPont Defendants for all appropriate injunctive relief to abate or mitigate the contamination that the DuPont Defendants caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## Eighth Count

### Negligence
### (As Against All Defendants)

275. Plaintiffs repeat each allegation of Paragraphs 1 through 274 above as though fully set forth in its entirety herein.

276. The DuPont Defendants had a duty to Plaintiffs to ensure that hazardous substances and pollutants were not discharged at the Parlin Site and did not injure groundwater, surface water, sediment, wetlands, soils, air, and biota at and around the Parlin Site.

277. 3M had a duty to the Department and the Administrator to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of PFAS and/or products containing PFAS, and other pollutants and hazardous substances.

278. The Defendants breached these duties.

279. As a direct and proximate result of the DuPont Defendants' discharges of hazardous substances and pollutants at the Parlin Site, groundwater, surface water, sediment, wetlands, soils, air, and biota at and around the site have been injured. The DuPont Defendants are jointly and severally liable for such injuries and the consequential damages.

280. As a direct and proximate result of 3M's negligence in designing PFAS and in failing to warn PFAS purchasers, the State,

and others that it was reasonably foreseeable would be harmed by PFAS of the dangers of 3M's products, groundwater, surface water, and other natural resources at and/or near the Parlin Site became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

281. As a further direct and proximate result of the DuPont Defendants' discharge of hazardous substances and pollutants at the Parlin Site, the Department and Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring and restoration costs, and expenses for which the DuPont Defendants are jointly and severally liable.

282. The Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against the Defendants as follows:

    a.  Finding the Defendants liable, jointly and severally, for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to

their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused contamination, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

i.     Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated by pollutants and hazardous substances;

ii.    Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of pollutants and hazardous substances until restored to non-detectable levels; and

iii.   Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of pollutants and hazardous substances, and restoration of such natural resources to their pre-discharge condition;

b.  Assessing the Defendants for all costs related to the investigation, cleanup, restoration, treatment, and

monitoring of contamination of the State's groundwater, surface waters, and other natural resources;

c.  Assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such natural;

d.  Assessing the Defendants for all compensatory damages for the lost value (including lost use) of the State's groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources;

e.  Assessing the Defendants for all other damages sustained by Plaintiffs as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight, and legal fees and expenses;

f.  Entering an order against the Defendants for all appropriate injunctive relief to abate or mitigate the contamination that Defendants caused;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by the Court;

h.  Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this

action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.


## Ninth Count

### Abnormally Dangerous Activity
### (As Against the DuPont Defendants)

283. Plaintiffs repeat each allegation of Paragraphs 1 through 282 above as though fully set forth in its entirety herein.

284. During the relevant period, the DuPont Defendants, utilized, disposed of, discharged, and emitted their PFAS at the Parlin Site.  These activities occurred in the immediate vicinity of the State's natural resources, including groundwater, air, surface water, sediments and soils, wetlands and biota, and the real and chattel property of the State's residents.

285. As a result of the DuPont Defendants use of PFAS at the Parlin Site, the State's natural resources were contaminated by PFAS.

286. The use of PFAS in the manufacture of other products and their disposal, discharge, and emission constitute ultra-hazardous activities that introduce an unusual danger into the community. These activities presented and continue to present a high degree of risk of harm to the State's natural resources, as well as the

real and chattel property of the State's residents. These activities have presented a high likelihood that the harm they would cause would be great. Neither Plaintiffs nor the broader community were able to eliminate this risk by the exercise of reasonable care, particularly in light of the DuPont Defendants failure to provide an adequate warning about the dangers involved.

287. The use, disposal, discharge, and emission of PFAS is not a matter of common usage in the areas in which the DuPont Defendants carried out these activities, and these activities were inappropriate to carry out in these locations.

288. At all relevant times, the risks of the DuPont Defendants abnormally dangerous activities outweighed the value to the community.

289. The DuPont Defendants acts and omissions in using, disposing, discharging, and emitting PFAS in the areas in which they did proximately caused the contamination of the State's natural resources and, upon information and belief, the real or chattel property of the State's residents. The DuPont Defendants are thus strictly liable for the harm these ultra-hazardous activities caused.

290. The DuPont Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against the DuPont Defendants as follows:

a. Finding the DuPont Defendants liable, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination in the State's groundwater, surface waters, and other natural resources so that such natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of their natural resources during all times of injury caused by PFAS products, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

   i. Past and future testing of groundwater, surface waters, and natural resources likely to have been contaminated for the presence of PFAS;

   ii. Past and future treatment of all groundwater, surface waters, and other natural resources containing detectable levels of PFAS until restored to non-detectable levels; and

      iii.     Past and future monitoring of the State's groundwater, surface waters, and other natural resources to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b. Ordering the DuPont Defendants to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of contamination of the State's groundwater, surface waters, and other natural resources caused by PFAS;

c. Ordering the DuPont Defendants to pay for all damages in an amount at least equal to the full cost of restoring the State's groundwater, surface waters, and other natural resources to their original condition prior to the contamination of such waters by PFAS;

d. Ordering the DuPont Defendants to pay for all compensatory damages for the lost value (including lost use) of the State's groundwater, surface waters, and other natural resources as a result of the contamination of such natural resources with PFAS;

e. Ordering the DuPont Defendants to pay for all other damages sustained by Plaintiffs as a direct and proximate result of their acts and omissions alleged

herein, including remedial, administrative, oversight, and legal fees and expenses;

f.   Entering an order against the DuPont Defendants for all appropriate injunctive relief to abate or mitigate the PFAS contamination that they caused;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.   Awarding Plaintiffs costs and fees in this action, including attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

## Tenth Count

### Strict Products Liability for Defective Design
### (As Against 3M)

291. Plaintiffs repeat each allegation of Paragraphs 1 through 290 above as though fully set forth in its entirety herein.

292. 3M designed, manufactured, and sold PFAS that were used at the Parlin Site during the relevant period.

293. As a manufacturer and seller of PFAS, 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.  3M owed that duty both to reasonably foreseeable users of its products and also

to any person who or property that might reasonably be expected to come into contact with those products.

294. 3M's PFAS were used in a reasonably foreseeable manner and without substantial change in the condition of such products. These products were defective and unfit for their reasonable use. 3M's PFAS foreseeably contaminated groundwater, surface water, and other natural resources at and around the Site.  3M knew or reasonably should have known that its manufacture, transportation, and/or sale, as well as its customers' use of 3M's PFAS in an intended or reasonably foreseeable manner, would result in the spillage, discharge, disposal, or release of PFAS onto land or into water, including at the Parlin Site.

295. PFAS used at the Parlin Site have injured and are continuing to injure groundwater, surface water, and other natural resources at and/or around the Site.  These PFAS were defective in design and unreasonably dangerous because, among other things:

a.  PFAS cause extensive and persistent contamination when they, or products containing them, are used in a reasonably foreseeable or intended manner;

b.  PFAS contamination in groundwater and surface water that are the sources of drinking water poses significant threats to public health and welfare; and

c.  3M failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies

to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS.

296. At all times relevant to this action, the PFAS that 3M designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

297. At all times relevant to this action, the foreseeable risk to public health and welfare posed by 3M's PFAS outweighed the cost to 3M of reducing or eliminating such risk.

298. At all times relevant to this action, 3M knew or should have known about reasonably safer feasible alternatives to PFAS, and the omission of such alternative designs rendered 3M's PFAS not reasonably safe.

299. As a direct and proximate result of the defects in the 3M's design, manufacture, and sale of PFAS, groundwater, surface water, and other natural resources at and/or near the Site became contaminated with PFAS in varying amounts over time, causing the State and its citizens significant injury and damage.

300. As a direct and proximate result of 3M's acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, and other natural resources at and/or near the Site.

301. As a further direct and proximate result of 3M's acts and omissions alleged in this Complaint, Plaintiffs have incurred,

and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface waters, and other natural resources at and/or near the Site with PFAS, for which Defendants are strictly, jointly, and severally liable

302. 3M knew it was substantially certain that its acts and omissions described above would cause the contamination and harms described herein.

303. Plaintiffs seek redress for exposure to toxic chemicals and/or substances at the Site, an industrial site, caused by the use of PFAS. Thus, this suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

304. 3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

305. 3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against 3M as follows:

a.   Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

1)   Past and future testing of natural resources at and around the Parlin Site likely to have been contaminated by PFAS;

2)   Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

3)   Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

b.   Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and

monitoring of PFAS contamination of the State's natural resources;

c.   Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d.   Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination of such natural resources;

e.   Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f.   Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g.   Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.   Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.   Awarding Plaintiffs such other relief as this Court deems appropriate.

**Eleventh Count**

**Strict Products Liability**
**(As Against 3M for Failure to Warn)**

306. Plaintiffs repeat each allegation of Paragraphs 1 through 305 above as though fully set forth in its entirety herein.

307. As a designer, manufacturer, and seller of PFAS, 3M had a strict duty to Plaintiffs and to those who were at risk of being harmed by PFAS to warn users of those products and the State of the foreseeable harms associated with them. 3M had a duty to warn the State about the dangers of PFAS because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; because the Department and the Commissioner are charged with enforcing the State's environmental laws and regulations; and because the State maintains a "quasi-sovereign" interest in the well-being of its residents.

308. 3M inadequately warned users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS of the likelihood that 3M's products would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases. To the extent 3M provided any warnings about its products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the

danger posed by PFAS, and the warnings did not convey adequate information on the dangers of PFAS to the mind of a reasonably foreseeable or ordinary user or bystander.

309. Plaintiffs seek redress for exposure to toxic chemicals and/or substances at the Parlin Site, an industrial site, caused by the use of PFAS. Thus, this suit is an "environmental tort action" as defined in the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 to -11.

310. Despite the fact that 3M knew or should have known about the risks of PFAS, 3M withheld such knowledge from Plaintiffs, other regulators, and the public. Moreover, 3M affirmatively distorted and/or suppressed its knowledge and the scientific evidence linking its products to the unreasonable dangers they pose, and 3M instructed users to release its products directly to the ground where PFAS would infiltrate drinking water supplies.

311. At no time relevant to this action did 3M warn users and buyers of its PFAS, the State, and others that it was reasonably foreseeable would be harmed by PFAS that PFAS would be released to the environment during their normal use, and of the widespread, toxic, and persistent effects of such releases.

312. 3M's PFAS were in the same condition when they were purchased and/or used as they were when they left 3M's control. 3M's customers used 3M's PFAS in a reasonably foreseeable manner

and without any substantial change in the condition of the products.

313. Had 3M provided adequate warnings about the hazards associated with their PFAS, users and buyers of its PFAS, Plaintiffs, and others that it was reasonably foreseeable would be harmed by PFAS, would have heeded those warnings.

314. As a direct and proximate result of 3M's failure to warn of the hazards of PFAS, groundwater, surface water, and other natural resources at and/or near the Parlin Site were contaminated with PFAS.

315. As a direct and proximate result of 3M's acts and omissions, Plaintiffs have incurred, are incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

316. 3M knew it was substantially certain that its acts and omissions described above would cause Plaintiffs' injury and damage.

317. 3M committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

318. 3M is strictly liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against 3M as follows:

a.   Finding 3M liable for all costs to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination at and around the Site so the contaminated natural resources are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost use and value of these natural resources during all times of injury caused by PFAS, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

   i.   Past and future testing of natural resources at and around the Site likely to have been contaminated by PFAS;

   ii.   Past and future treatment of all natural resources at and around the Site containing detectable levels of PFAS until restored to non-detectable levels; and

   iii.   Past and future monitoring of the State's natural resources at and around the Site to detect the presence of PFAS, and restoration

of such natural resources to their pre-discharge condition;

b.  Ordering 3M to pay for all costs related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources;

c.  Ordering 3M to pay for all damages in an amount at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination;

d.  Ordering 3M to pay for all compensatory damages for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination of such natural resources;

e.  Ordering 3M to pay for all other damages sustained by Plaintiffs in their public trustee, parens patriae, and regulatory capacities as a direct and proximate result of 3M's acts and omissions alleged herein;

f.  Entering an order against 3M to abate or mitigate the PFAS contamination that it caused at and around the Site;

g.  Awarding Plaintiffs punitive damages in an amount to be determined by this Court;

h.  Awarding Plaintiffs costs and fees in this action, including reasonable attorneys' fees, incurred in

prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.    Awarding Plaintiffs such other relief as this Court deems appropriate.


**Twelfth Count**
**Actual Fraudulent Transfer**
**(As Against DuPont and Chemours Co.)**

319. Plaintiffs repeat each allegation of Paragraphs 1 through 318 above as though fully set forth in its entirety herein.

320. Plaintiffs are and were creditors of Chemours Co. at all relevant times.

321. Through its participation in the Spinoff, as detailed above, Chemours Co. transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Assumed Liabilities").

322. The Transfers and Assumed Liabilities were made for the benefit of DuPont.

323. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

324. Chemours Co. made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours Co.

325. Plaintiffs have been harmed as a result of the Transfers.

326. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

a.  Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

b.  Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

c.  Awarding Plaintiffs such other relief as this Court deems appropriate.

**<u>Thirteenth Count</u>**

**Constructive Fraudulent Transfer
(As Against DuPont and Chemours Co.)**

327. Plaintiffs repeat each allegation of Paragraphs 1 through 326 above as though fully set forth in its entirety herein.

328. Plaintiffs are and were creditors of Chemours Co. at all relevant times.

329. Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

330. Each of the Transfers and Chemours Co.'s assumption of the Assumed Liabilities was made to or for the benefit of DuPont.

331. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

332. Chemours Co. made the Transfers and assumed the Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

333. Chemours Co. was insolvent at the time or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

334. At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, DuPont and Chemours Co. intended Chemours Co. to incur, or believed, or reasonably should have believed that Chemours Co. would incur debts beyond its ability to pay as they became due.

335. Plaintiffs have been harmed as a result of the Transfers.

336. Under Del. Code. Tit. 6 Sec. 1301 to 1312 and N.J.S.A. 25:2-20 to 25:2-34, Plaintiffs are entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter judgment against DuPont and Chemours Co. as follows:

    a.    Voiding the Transfers to the extent necessary to satisfy the Plaintiffs' claims;

    b.    Awarding Plaintiffs prejudgment interest and attorneys' fees and costs; and

    c.    Awarding Plaintiffs such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs are entitled to a jury trial and hereby demand a trial by jury.

## RULE 4:5-1 CERTIFICATION

I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any action pending in any other court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, except the following pending actions: NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., GLO-L-000388-19 (relating to the DuPont/Chemours "Repauno site"); NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., MID-L-002448-19 (relating to the DuPont Chemours "Chambers Works site"); and NJDEP, et al. v. E.I. du Pont de Nemours & Company, et al., PAS-L-000936-19 (relating to the

DuPont/Chemours "Pompton Lakes site"). I know of no other parties other than the parties set forth in this pleading who should be joined in the above action. I recognize the continuing obligation of each party to file with the Court and serve on all parties an amended Certification if there is a change in the facts stated in the original Certification.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Plaintiffs designate Leonard Z. Kaufmann, Esq., as trial counsel in this matter.

Dated:  May 31, 2019

**Gurbir S. Grewal**
**ATTORNEY GENERAL OF NEW JERSEY**
*Attorneys for Plaintiffs*

By: */s/ Gwen Farley*
Gwen Farley
Deputy Attorney General
  (Atty. ID #000081999)
Richard J. Hughes Justice Complex
25 Market Street; PO Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 376-2761

**COHN LIFLAND PEARLMAN**
  **HERRMANN & KNOPF LLP**
Special Counsel to the Attorney General

By: */s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann
  (Atty. ID #045731994)
A Member of the Firm
Also by:  Joseph A. Maurice
          Christina N. Stripp
 Park 80 West - Plaza One
 250 Pehle Avenue, Suite 401
 Saddle Brook, New Jersey 07663
 Tel.: (201) 845-9600

**KELLEY DRYE & WARREN LLP**
Special Counsel to the Attorney General
By:    William J. Jackson
       John Gilmour
       David Reap
       Melissa E. Byroade
515 Post Oak Blvd. Suite 900
Houston, Texas 77027
Tel.: (713) 355-5000

**LAW OFFICES OF JOHN K. DEMA, P.C.**
Special Counsel to the Attorney General
By:    John K. Dema
       Scott E. Kauff
       John T. Dema
       James Crooks
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 00820-5034
Tel.: (340) 773-6142