**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>E.I. DU PONT DE NEMOURS AND COMPANY, et al.<br><br>*Defendants*. | Civil Action Nos.<br>19-14766,<br>19-14767<br><br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter involves four cases, two of which are pertinent here, that have been consolidated before the Court for pretrial proceedings.  Currently pending is Defendant 3M Company's ("3M" or "Defendant") partial motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' Second Amended Complaints ("SACs") Civil Nos. 19-14766 and 19-14767.[1]  The Court reviewed all submissions in support of the motion and opposed to it,[2] and

---

[1] The SAC in Civil No. 19-14766, D.E. 57, will be referred to as "CWSAC."  The SAC in the Civil No. 19-14767, D.E. 73, and will be referred to as "PSAC."

[2] The following are taken from Civil No. 19-14767.  Defendant's brief in support of the instant motion, D.E. 93-1 will be referred to as "D. Br."; Plaintiffs' brief in opposition, D.E. 106, will be referred to as "Opp'n"; Defendant's reply to Plaintiffs' opposition, D.E. 116, will be referred to as "D. Reply."

considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and

Local Civil Rule 78.1(b).  For the reasons that follow, Defendant's motion is **DENIED**.

I.       FACTS AND PROCEDURAL HISTORY

A. FACTS

The consolidated cases arise out of Defendant E.I. du Pont de Nemours and Company's

("Old DuPont") alleged contamination of four different sites in New Jersey, which Plaintiffs refer

to as (1) the Chambers Works Site[3]; (2) the Parlin Site[4]; (3) the Pompton Lakes Works Site[5]; and

(4) the Repauno Site.[6]  The instant motions concern the first two.  *See* CWSAC ¶ 1; PSAC ¶ 1.

Plaintiffs allege that for decades, Old DuPont discharged hazardous substances at each

location, while knowing for at least for several of those decades that those substances do not

naturally degrade and are dangerous to health and to the environment.  *See, e.g.*, CWSAC ¶¶ 1-4.

More specifically, Plaintiffs allege that Old DuPont released per- and polyfluoroalkyl substances

("PFAS") and perfluorooctanoic acid ("PFOA") into the environment since, at the latest, the first

half of the twentieth century, *see* PSAC ¶ 3, despite knowing for about fifty years "that[] PFOA,

PFNA[7] and other PFAS compounds are extremely resistant to degradation, they persist

indefinitely in the environment, they bioaccumulate in blood, and they pose a substantial threat to

human health and the environment."  CWSAC ¶ 4.

---

[3] Civ. No. 19-14766.

[4] Civ. No. 19-14767.

[5] Civ. No. 19-14758.

[6] Civ. No. 19-14765.

[7] "PFNA" is short for "perfluorononanoic acid."

Defendant 3M is a Delaware corporation headquartered in St. Paul, Minnesota.  *Id.* ¶ 21.  Plaintiffs represent that "for most of the past several decades, 3M has been the primary manufacturer of PFOA and PFOS."  *Id.* ¶ 117.  3M began producing those substances in the 1940s and phased out production in the early 2000s, allegedly due to pressure from the federal Environmental Protection Agency ("EPA").  PSAC ¶¶ 90, 117.  Plaintiffs allege that by 1956, 3M and Old DuPont learned that "3M's PFAS compounds" bioaccumulate "in the human body[,]" and that "[b]y the 1970s, 3M" knew that its compounds were hazardous to the general population.  *Id.* ¶¶ 93-97.  Plaintiffs add that "[i]n 1975, 3M found there was a 'universal presence' of PFOA in blood serum samples taken from across the United States."  *Id.* ¶ 99.  Plaintiffs continue that in the late 1970s, 3M began resisting internal calls to fully study the environmental impact of its compounds.  *Id.* ¶¶ 103-04.  In 1980, Plaintiffs allege, Old DuPont confirmed that PFOA is toxic, that it accumulates in human tissue, and that "continued exposure is not tolerable."  *Id.* ¶ 106.  Plaintiffs accuse 3M of "actively [seeking] to suppress scientific research on the hazards associated those products, and [mounting] a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and ecological risks of its PFOA and PFOS products."  *Id.* ¶ 116.

Plaintiffs allege that, starting in the 1940s, 3M sold PFAS and products with PFAS and shipped PFOA and PFOS to manufacturers across the United States, including Old DuPont.  *Id.* ¶ 90.  Old DuPont, in turn, discharged PFOA from the Parlin Site and other sites.  *Id.* ¶ 90.  Plaintiffs continue that in 1951, Old DuPont first began purchasing PFOA from 3M for use manufacturing its product Teflon®.  CWSAC ¶ 115.  Plaintiffs explain that Old DuPont used PFOA to manufacture fluoroelastomers at the Chambers Works Site beginning in the late 1950s, used it to make standard fluoroelastomers until 2001, and used it make perfluoroelastomers and specialty

3

fluoroelastomers until 2013.  *Id.* ¶ 150.  Old DuPont also used the Chambers Works Site to store

waste with PFOA generated at another DuPont site in West Virginia.  *Id.* ¶ 154.  Plaintiffs report

that in 1999, for example, "Old DuPont estimates it transferred 13,400 pounds of PFOA-containing

waste from [West Virginia] to Chambers Works; released at least 25,500 pounds of PFOA into

water; dumped at least 8,000 pounds of PFOA-containing waste into landfills on-site; and emitted

300 pounds of PFOA-related chemicals into air."  *Id.* ¶ 158.

### B. Procedural History

Plaintiffs filed Complaints in New Jersey state court, D.E. 1-1,[8] which Defendants removed

to this Court, D.E. 1.  Plaintiffs then filed the SACs.  CWSAC; PSAC.  As noted, there are currently

four cases pending, but 3M is a defendant in only two.  Plaintiffs bring several claims against

Defendant, including claims under New Jersey's Spill Compensation and Control Act (the "Spill

Act"), N.J. Stat. Ann. §§ 58:10-23.11 to -23.24; under the Brownfield and Contaminated Site

Remediation Act (the "Brownfield Act"), N.J. Stat. Ann. §§ 58:10B-1 to -31; and under New

Jersey common law for products liability.  Defendant 3M responded with the instant motions.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a count

for "failure to state a claim upon which relief can be granted[.]"  To withstand a Rule 12(b)(6)

motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible

on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the plausibility standard "does not impose a probability requirement, it does require a

---

[8] Civ. No. 19-14766 was also removed from New Jersey state court.  Civ. No. 19-14766 D.E. 1.

4

pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotations and citations omitted).

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). A court "must accept all of the complaint's well-pleaded facts as true." *Id.* at 210. A court, however, does not credit labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555 (internal quotations omitted); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). But even if plausibly pled, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

### III.    ANALYSIS

Defendant raises three arguments as to why certain counts in the CWSAC and PSAC should be dismissed.[9] The Court considers each in turn.

#### A.  Spill Act and Brownfield Act

First, Defendant argues that Plaintiffs have not stated a claim under the Spill Act or Brownfield Act. D. Br. at 4. The crux of Defendant's argument is that Plaintiffs have not sufficiently pled under the Spill Act that Defendant is a person responsible for the discharges at the Chambers Works or Parlin Sites. *Id.* at 5. Plaintiffs counter that Defendant is liable under the

---

[9] In a footnote, Defendant argues that Plaintiffs' application for punitive damages should also be dismissed. D. Br. at 13 n.13. Plaintiffs oppose the argument. *See* Opp'n at 39-40. The Court will not address this argument because it is not properly before the Court. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal citation omitted).

Spill Act in light of the plain language of the statute, legislative intent, and analogous cases.  Opp'n
at 10-22.

In relevant part, the Spill Act provides that, with certain unrelated exceptions, "any person
who has discharged a hazardous substance, or is in any way responsible for any hazardous
substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and
removal costs no matter by whom incurred."  N.J. Stat. Ann. § 58:10-23.11g(c)(1).  Plaintiffs
allege that Defendant 3M is a "person who … is any way responsible for [a] hazardous substance."
Opp'n at 11.

Defendant asserts that New Jersey courts have interpreted that subsection as requiring a
plaintiff to show the "necessary connection between the offending discharge and the discharger
and/or owner of the property."  D. Br. at 5 (quoting  *New Jersey Department of Environmental
Protection v. Dimant*, 4 A.3d 780, 788 (N.J. Super. Ct. App. Div. 2011), *aff'd*, 51 A.3d 816 (N.J.
2012).  Defendant further argues that such a connection can be shown through "either ownership
or control over the property at the time of the damaging discharge, or control over the hazardous
substance that caused the contamination."  *Id.* (quoting *Dimant,* 4 A.3d at 788).  Plaintiffs respond
that manufacturing and selling PFAS to Old DuPont, which was subsequently discharged in New
Jersey, is enough to make Defendant potentially liable under the Spill Act.  Opp'n at 16-17.

The Spill Act does not define the language, "in any way responsible for any hazardous
substance[.]"  The Act, does, however, instruct that it is to "be liberally construed to effect its
purposes."  N.J. Stat. Ann. § 58:10-23.11x.  The New Jersey Supreme Court has described N.J.
Stat. Ann. § 58:10-23.11g(c)(1) as "establish[ing] a broad scope of liability[.]"  *Dimant¸* 51 A.3d
at 821.  The Supreme Court of New Jersey has explained that in "an action to obtain damages,
authorized costs and other similar relief under the Act there must be shown a reasonable link

between the discharge, the putative discharger, and the contamination at the specifically damaged site." *Id.* at 834.  The *Dimant* Court stated that "it is not enough for a plaintiff to simply prove that a defendant produced a hazardous substance and that the substance was found at the contaminated site and 'ask the trier of fact to supply the link.'"  *Id.* at 833-34 (quoting *N.J. Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 105 n.9 (3d Cir. 1999)).

In *Giordano v. Solvay Specialty Polymers USA, LLC*, another court in this district considered a motion by 3M to dismiss a Spill Act claim arising, in part, out of Old DuPont's activities at the Chambers Works Site.  522 F. Supp. 3d 26, 29-30 (D.N.J. 2021).  The plaintiffs in *Giordano* alleged that Old DuPont's activities at the Chambers Works Site, along with the actions of another defendant, had contaminated the plaintiffs' drinking water.  *Id.* at 29-31.  In Judge Hillman's published decision, the court summarized Old DuPont's activities at the Chambers Works Site and echoed the allegation that "3M supplied DuPont with PFOA."  *Id.* at 30.  In a footnote, the *Giordano* court addressed 3M's argument "that as a manufacturer, rather than a discharger, of PFAS, it cannot be held liable under the Spill Act because Plaintiffs have not alleged the requisite connection between the manufacturing of a hazardous substance and the other Defendants' discharge of the hazardous substance."  *Id.* at 35 n.7.  Relying on *Dimant*'s analysis as to the breadth of the Spill Act and the statute's "in any way responsible for any hazardous substance" language, the *Giordano* court ruled that the plaintiffs had sufficiently alleged that 3M was "in any way responsible for" the "contaminated water supply[]" at issue in that case, without further discussion.  *Id.* (quoting *Dimant*, 51 A.3d at 821).

The Court finds *Giordano* persuasive and finds that Plaintiffs have sufficiently pled that 3M is "in any way responsible for" the discharge of hazardous substances at both of the Sites at issue in this motion.  Plaintiffs plausibly allege that "Old DuPont purchased the PFOA it required

for its manufacturing activities" at the Parlin Site "from Defendant 3M."  PSAC ¶ 68.  Plaintiffs

assert the same as to the Chambers Works Site.  *See* CWSAC ¶ 118.  Plaintiffs add that Old DuPont

used the Chambers Works Site as a dumping ground for "PFOA-containing waste generated at"

another of Old DuPont's properties in West Virginia.  CWSAC ¶¶ 154, 158.  The Court finds that

these links have been sufficiently pled to satisfy the Spill Act's nexus requirement.

### B.  Failure to Warn

Next, Defendant argues that Plaintiff has not adequately pled its common law failure-to-

warn claim,[10] because (1) 3M did not have a duty to warn the State; (2) Plaintiffs have not

sufficiently pled that 3M failed to provide adequate warnings to Old DuPont; and (3) Plaintiffs

have not sufficiently pled that 3M's failure to warn Old DuPont proximately caused Plaintiffs'

injuries.  D. Br. at 6, 9, 12.  Plaintiffs clarify that this cause of action is limited to Defendant's

alleged failure to warn the State and does not concern warnings to Old DuPont.  Opp'n at 35 n.8.

As a result, the Court does not reach 3M's second and third arguments.

The State argues that Defendant owed a duty to warn the State that 3M's PFAS-containing

products could endanger New Jersey's citizens and environment.  Opp'n at 23.  The State asserts

that the duty stemmed from its role as *parens patriae* and as trustee of New Jersey's environment

and natural resources.  *Id.*  The State continues that duty arises from New Jersey common law.  *Id.*

at 24-35.

The *parens patriae* doctrine reflects the State of New Jersey's authority to act for those

citizens of New Jersey who cannot protect or advance their own interests.  *Matter of S.L.*, 462 A.2d

---

[10] The parties acknowledge that New Jersey's Product Liability Act, N.J. Stat. Ann. §§ 2A:58C-1, *et seq.*, contains an express carveout for "a civil action seeking damages for harm where the cause of the harm is exposure to toxic chemicals or substances[.]"  N.J. Stat. Ann. § 2A:58C-1(b)(4); N.J. Stat. Ann. § 2A:58C-6.  *See also Macrie v. SDS Biotech Corp.*, 630 A.2d 805, 808 n.1 (N.J. Super. Ct. App. Div. 1993).

1252, 1256 (N.J. 1983).  Courts have also recognized the State's authority under that doctrine to take action to protect New Jersey's citizens from harm caused by environmental pollution.  *See, e.g.*, *Howell Twp. v. Waste Disposal, Inc.*, 504 A.2d 19, 24-25 (N.J. Super Ct. App. Div. 1986). The public trust doctrine provides that the State of New Jersey holds the state's natural resources in trust for the benefit of its citizens.  *Borough of Neptune City v. Borough of Avon-by-Sea*, 294 A.2d 47, 51-53 (1974).

Defendant, however, argues that this Court may not decide novel common law duties.  D. Br. at 8.  Relying on *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96 (3d Cir. 1994), among others, Defendant contends that the Third Circuit has held that federal courts may not act as "judicial pioneers" in the province of state law and that federalism requires federal courts to desist from expanding or modifying state common law.  *Id.* (quoting *Leo*, 37 F.3d at 101).

When a federal court applies state law, and the state's highest court has not yet addressed the issue, the federal court must apply the state law as it determines the highest court would.  *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011); *see also Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  Indeed, the Third Circuit has gone so far as to call it an "abdication" of a federal court's responsibility to not do so.  *Jaworski v. Ciasulli*, 490 F.3d 331, 332 n.1 (3d Cir. 2007).  Of course, a federal court may not *modify* the ruling of a state's highest court even if a federal judge believes that the state's highest court is moving in that direction.  *See Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975).

The Third Circuit has made clear the process a court must follow in determining how a state supreme court will rule on an issue:

> In the absence of a controlling decision by the Pennsylvania Supreme Court, we must predict how it would rule if faced with the issue. *Covington v. Cont'l Gen. Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004).  In making such a prediction, "we must look to decisions

of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Norfolk S. Ry. Co*. [*v. Basell USA Inc.*]*,* 512 F.3d [86, 92 (3d Cir. 2008] (internal quotation marks omitted). We must be mindful that "our duty is to apply state law ... irrespective of what we may regard as its merits," *Krauss v. Greenbarg,* 137 F.2d 569, 571 (3d Cir. 1943); we may not impose our own view of what state law should be, *McKenna v. Pac. Rail Serv.,* 32 F.3d 820, 825 (3d Cir. 1994), nor "expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421 (3d Cir. 2002).

*Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216-17 (3d Cir. 2010).

In *Leo*, the Third Circuit faced a question of successor liability under New Jersey law and analyzed the leading New Jersey case on that issue, *Ramirez v. Amstead Industries*, 431 A.2d 811 (N.J. 1981). 37 F.3d at 97-99. Acknowledging that the facts of *Leo* had not been addressed by the New Jersey Supreme Court, the Third Circuit characterized its task as "predict[ing] how the Supreme Court of New Jersey would resolve the issues in this case." *Id.* at 99-101. The *Leo* court then thoroughly analyzed *Ramirez*'s three considerations for imposing successor liability. *Id.* at (citing *Ramirez*, 431 A.2d at 820). After concluding that *Ramirez*'s rationales did not support a finding of successor liability on the facts before it, the court in *Leo* observed that "[o]ur role is to apply the current law of the jurisdiction, and leave it undisturbed." *Id.* at 101 (quoting *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993)).

The New Jersey Supreme Court has not ruled on the issue before the Court. As a result, the Court is not disturbing any binding precedent of New Jersey's highest court. *Leo*, 37 F.3d at 101. Similarly, 3M points to no authority indicating that the State asks the Court to expand New Jersey law in a manner "not foreshadowed by state precedent." *Spence,* 623 F.3d at 217 (citation omitted). To the contrary, the New Jersey Supreme Court, along with the state's lower courts,

10

have a long history of providing detailed guidance as to how a court should analyze whether a duty

to warn exists.  And, as set forth above, New Jersey also recognizes the *parens patriae* and public

trust doctrines.

Accordingly, the Court proceeds to analyze whether there is, under New Jersey law, a duty

to warn as alleged by Plaintiffs.  In determining whether a duty exists at common law, the New

Jersey Supreme Court first asks whether it was foreseeable that a party's conduct was capable of

harming another.  *J.S. v. R.T.H.*, 714 A.2d 924, 928-29 (N.J. 1998).  Once foreseeability has been

established, the New Jersey Supreme Court assesses four additional factors: "the relationship of

the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the

public interest in the proposed solution."  *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1116

(1993); *see also Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1148 (N.J. 2006).  The Court weighs

and balances those factors in the totality of the circumstances and in light of the public policy of

New Jersey, and ultimately considers the existence of a duty to be a question of fairness.  *Hopkins*,

625 A.2d at 1116.

The Court, therefore, begins by assessing whether it was foreseeable to 3M that its products

could harm the State of New Jersey's citizens and natural resources.  The New Jersey Supreme

Court has explained that "the defendant's knowledge of the risk of injury" is at the heart of the

foreseeability analysis.  *J.S.*, 714 A.2d at 928.  Indeed, that court has gone so far as describe

foreseeability as being of "paramount importance[,]" *Schwartz v. Accuratus Corp.*, 139 A.3d 84,

91 (N.J. 2016), and explained that whether a duty exists "devolves to a question of foreseeability

of the risk of harm to that individual or identifiable class of individuals[,]" *Olivo*, 895 A.2d at

1148.  In other words, foreseeability is a "primary" and "foundational" element.  *J.S.*, 714 A.2d at

928, 929.  Further "special knowledge" on the defendant's part that a particular plaintiff may be harmed can swing a close case.  *Id.* at 928.

Because the Court confronts the question in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court takes as true Plaintiffs' well-pled factual allegations and all reasonable inferences therefrom.  *Fowler*, 578 F.3d at 210.[11]  In the SACs, Plaintiffs allege that by 1956, 3M had actual knowledge that PFAS accumulates in the human body and, by 1963, knew that PFAS can seep into the environmental surroundings of industrial facilities, where it would not naturally degrade.  CWSAC ¶¶ 121-24; PSAC ¶¶ 93-96.  As years passed, 3M, according to the SACs, uncovered further proof that its products could, would, or was causing harm in the precise manner complained of in the SACs.  In the 1970s, 3M was concerned that the general population could be endangered by exposure to fluorochemicals, and in 1978, animal experimentation showed that PFAS ingestion was lethal.  PSAC ¶¶ 97, 101; CWSAC ¶¶ 125, 129.  In the late 1970s, 3M also uncovered proof that effluent containing its substances was poisoning a river near one of its plants in Alabama.  PSAC ¶ 103; CWSAC ¶ 131.

3M—the moving party—does not address the key, indispensable element of foreseeability as to its duty to warn.  D. Br. at 6-9.  But Plaintiffs do.  Plaintiffs assert that 3M designed and manufactured PFAS and sold the chemicals to Old DuPont for use and disposal at the two New Jersey sites.  Opp'n. at 26 (citations omitted).  The State continues that 3M knew "for decades that PFAS presented a significant threat to the environment and human health based on its own experience and scientific research confirmed these dangers."  *Id.* (citations omitted).  The State next asserts that not only did 3M not warn of these dangers, it took active steps to hide its

---

[11] Defendant appears to argue that the facts as pled collectively do not support the imposition of a common law duty.  Accordingly, the Court likewise considers the facts in the aggregate.

knowledge and the dangerousness of PFAS. *Id.* at 27 (citations omitted). In its reply, 3M merely addresses foreseeability in the context of certain cases, asserting that the New Jersey Supreme Court has "declined to adopt an open-ended duty to warn based on mere foreseeability." D. Reply at 8. Defendant's reply misses the mark; foreseeability is the "paramount concern" in deciding whether a duty exists. *Schwartz*, 139 A.3d at 91. 3M implicitly concedes the foreseeability of the harm. To the extent that it does not, the Court finds that Plaintiff has adequately established foreseeability of the harm.

Having determined that the harm suffered by Plaintiffs was foreseeable, the Court proceeds to analyze the fairness factors. *Olivo*, 895 A.2d at 1148. As noted, those factors are "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins*, 625 A.2d at 1116. 3M's moving brief only addresses two issues: the relationship of the parties and its duty to warn vis-à-vis Old DuPont. D. Br. at 6-12. The latter is not in issue, meaning that 3M effectively concedes that three of the factors—the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution—weigh in favor of finding a duty exists. Nevertheless, the Court reviews each factor.

As to the first factor, 3M asserts that under "under New Jersey law, the existence of a duty presupposes some relationship between the parties." D. Br. at 7 (citing Hopkins, 625 A.2d at 1116). As noted, the relationship of the parties is one factor to consider. *Hopkins*, 625 A.2d at 1116. To the extent 3M is implicitly asserting that it is only accountable to Old DuPont, with whom it had a direct relationship, the Court again disagrees. First, returning to the crucial foreseeability inquiry, the Court again notes that the New Jersey Supreme Court has instructed that whether a duty exists "devolves to a question of foreseeability of *the risk of harm to that individual*

13

*or identifiable class of individuals*." *Olivo*, 895 A.2d at 1148 (emphasis added).  The New Jersey

Supreme Court did not limit its inquiry to those with whom a defendant had a relationship.

More importantly, New Jersey courts have not limited the duty to warn to those with whom

a defendant has a direct relationship.  In *Macrie*, the court rejected the defendant's "contention

that as a matter of law it had no obligation warn plaintiffs because they were not 'users' of its

products." *Macrie*, 630 A.2d at 809.  In that case, the defendant manufactured a fungicide that it

sold with a six-page brochure pursuant to federal regulations that outlined the product's potential

harmful effects. *Id.* at 807.  That exhaustive warning appears to have been sufficient.  A purchaser

of the fungicide, however, used it and then sold treated vegetables to a third-party, whose workers

were seriously injured by exposure to the fungicide. *Id.* at 807-08.  The *Macrie* court found that a

jury could reasonably find that the manufacturer failed to warn the downstream employees. *Id.* at

808-11.  Similarly, in *Olivo*, the New Jersey Supreme Court held that the defendant, a company at

which the plaintiff worked as a welder and was exposed to asbestos, owed a duty to the plaintiff's

wife, who was injured by inhaling the asbestos on her husband's clothes when she laundered them.

895 A.2d at 1146.  This was so even though the wife had never actually entered onto the

defendant's premises—it was enough that the harm that befell the plaintiff's wife was foreseeable,

in the *Olivo* court's view, to make it fair to foist a duty upon the defendant. *Id.* at 1146, 1149.

Later, in *Schwartz*, the New Jersey Supreme Court determined that the duty could extend to other

members of the household.  139 A.3d at 85-86, 92.  The *Schwartz* court noted that a "chance

contact with a worker transporting home a toxic substance from another's premises should not

suffice to create a duty of care[.]" *Id.* at 92.  The court continued that the relationship between the

parties was "of necessity, relevant and weighty[,]" and speaks to both the existence and contours

of a duty. *Id.*

The Court finds that the relationship between 3M and the State does not foreclose imposing a duty to warn. Clearly, 3M and the State did not have a direct business relationship. Nevertheless, the State is duty-bound to protect its citizens and its environment, both of which were harmed by 3M's conduct, accepting the State's allegations as true. *See New Hampshire v. Exxon Mobil Corp.*, 126 A.3d 266, 289-90 (N.H. 2015) (noting that a state, as *parens patriae*, has an active interest in its citizen's health and its environment's wellbeing; is not a mere spectator to the transactions that go on within its borders). The relationship here does not bespeak of the "chance encounter" warned of by the New Jersey Supreme Court in *Schwartz*.

Next, the nature of the attendant risk was great. The State describes in detail how 3M's products allegedly polluted the State of New Jersey's environment and endangered its people. *E.g.*, CWSAC ¶¶ 109, 111; PSAC ¶¶ 81, 83. The nature of the harm, in terms of both its gravity and its breadth, is great and permanent. This factor weighs strongly in imposing a duty.

Likewise, 3M had the opportunity to exercise care or provide the State a warning. According to the SACs, 3M began produce PFAS-containing materials in the 1940s and phased out production in the early 2000s. The State plausibly alleges that 3M had actual notice of a potential problem with PFAS starting in 1956 and goes on to provide additional specific allegations as to 3M's increasing knowledge over the next several decades. Additionally, as the manufacturer of those products, 3M had a special opportunity to know of the dangerous properties of chemicals. Finally, while 3M protests that any potential duty to warn would be "amorphous," D. Reply at 10, the Court is confident that if 3M had desired to report an environmental hazard in New Jersey, it would have located the correct agency or agencies in short order. Accordingly, the Court finds that this factor also weighs in favor of imposing a duty to warn.

15

Finally, the Court finds that the public interest similarly favors the finding of a duty. Indeed, the prevention of far-reaching environmental and human harm is of paramount public concern. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442-43 (1960).

In sum, the Court finds that imposing a duty to warn on 3M is consistent with the foreseeability of the harm and a balancing of the fairness factors. 3M asserts the following:

> [T]he consequences of recognizing such a duty are especially acute here, where the at-issue product(s) sold by 3M to Old DuPont were not designated as hazardous substances by the State until years after they allegedly were discharged into the environment by Old DuPont and after 3M's last sale to Old DuPont.

D. Reply at 9. Assuming the State's plausible allegations as true, it would appear this is the precise reason why a duty should be imposed. The State did not have timely knowledge or information necessary to protect its citizens and resources, but 3M did.

In addition, as Plaintiffs point out, both the Supreme Court of New Hampshire and the District of Maryland have held that the common law of those states required manufacturers to warn the states of the dangerous propensities of their products. *See Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019); *New Hampshire v. Exxon Mobil Corp.*, 126 A.3d 266 (N.H. 2015). Obviously, both matters were decided pursuant to the law of other states, but the cases are otherwise analogous.

In *Maryland*, the state sued sixty-five defendants because its waters were polluted with methyl tertiary butyl ether ("MTBE"). 406 F. Supp. 3d at 432. MTBE was an oxygenate additive that was blended into gasoline in the 1980s and 1990s. *Id.* MTBE was added to the gasoline at the refineries or at terminals. *Id.* at 434. MTBE reached the environment in numerous ways, including through disposals, spills, evaporative releases, and in underground storage tanks during delivery. *Id.* Once released, MTBE was highly soluble in ground water, spread rapidly, did not

16

naturally degrade, and was resistant to removal and treatment in ground water.  *Id.*  MTBE was then found in different public water systems and private drinking-water wells in the state.  *Id.*  Maryland sued as *parens patriae*, as trustee for its natural resources, and pursuant to state statute, alleging that the defendants knew as early as 1980 that MTBE was harmful and could contaminate groundwater but failed to warn or use a safer alternative.  *Id.* at 436.  The defendants instead defended and promoted MTBE.  *Id.*  The defendants included manufacturers, distributors, and sellers.  *Id.* at 465.  The court in *Maryland* found that the state had plausibly alleged that the defendants had a duty to warn the state of the dangers associated with MTBE because, among other things, Maryland sufficiently alleged that the harm it suffered was foreseeable as a result of the defendants' placement of MTBE gasoline into the state's market.  *Id.* at 463.

*New Hampshire* likewise concerned MTBE.  126 A.3d at 274.  New Hampshire sued gasoline suppliers, refiners, and chemical manufacturers for damage to its groundwater caused by MTBE.  *Id.*  As to the duty warn, defendant Exxon Mobil argued on appeal that "it did not have a duty to warn the government as sovereign, rather than as end user or consumer[.]"  *Id.* at 289.  The Supreme Court of New Hampshire rejected this argument, reasoning as follows:

> In *State v. City of Dover,* 891 A.2d 524 (2006), we determined that the State was the proper party to bring suit against the MTBE defendants, because it "has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply."  *City of Dover,* 891 A.2d at 529.  In addition, we concluded that the State satisfied the requirements of *parens patriae* standing because it asserted an injury to a quasi-sovereign interest, and alleged injury to a substantial segment of its population.  *Id.* at 530.  "[A] state may act as the representative of its citizens where the injury alleged affects the general population of a State in a substantial way."  [*New Hampshire v.*] *Hess* [*Corp.*]*,* 20 A.3d 212, 218 [(N.H. 2011)] (quotation omitted).  Accordingly, we held that the State has *parens patriae* standing to bring suit against the MTBE defendants on behalf of the residents of New Hampshire.  *City of Dover*, 891 A.2d at 530.

*Id.* at 290 (first alteration in original).

Like certain defendants in both *Maryland* and *New Hampshire*, 3M was an out-of-state manufacturer whose allegedly harmful product was used in conjunction with another product. Similarly, 3M allegedly knew of the harmful nature of its product but did not warn New Jersey, resulting in harm to the state's environment and population. And in both *Maryland* and *New Hampshire*, the courts determined that the defendants' duty to warn extended to the state as *parens patriae* and as trustee for the natural resources.

For the foregoing reasons, the Court finds that Plaintiffs have plausibly alleged a failure to warn and denies 3M's motion on this ground.

### C. Design Defect

Finally, Defendant argues that Plaintiffs have not plausibly pled a design defect claim. D. Br. at 12. To state a claim for design defect under New Jersey law, "[a] 'plaintiff must plead either that the product's risk outweighs its harm, or that an alternate design exists[.]'" *Mendez v. Shah*, 28 F. Supp. 3d 282, 297-98 (D.N.J. 2014). Plaintiffs do not assert that an alternate design exists. Opp'n at 37. Defendant argues that Plaintiffs have not sustained their pleading burden because they alleged "only that 'the foreseeable risk to public health and welfare … outweighed the cost to 3M of reducing or eliminating such risk." D. Br. at 12 (emphasis deleted) (quoting CWSAC ¶ 434; PSAC ¶ 388). Plaintiffs reply that 3M is "seek[ing] to elevate form over substance, by arguing that, because the State did not explicitly recite in its Complaints that 3M's PFAS's dangers outweighed their utility, its claim fails as a matter of law." Opp'n at 37-38.

In support, Plaintiffs cite to *Fabricant v. Intamin Amusement Rides International Corp.*, No. 19-12900, 2020 WL 373348 (D.N.J. Jan. 23, 2020). In that case, the plaintiffs were injured on a roller coaster and sued its manufacturer, claiming that the ride had been defectively designed

because its component parts' risk outweighed their utility. *Id.* at \*\*1-4. The defendants sought to

dismiss the claim as inadequately pled. *Id.* at \*4. The *Fabricant* court noted that the plaintiffs had

"not explicitly weigh[ed]" the parts' "utility and risks[,]" but observed that the plaintiffs did

"weigh the utility and risks when describing the 'unreasonable risk of whiplash injury to the

vertebrae of [riders'] necks and spines' associated with [the roller coaster]." *Id.* (first alteration in

original). The court concluded that the plaintiffs had sufficiently stated a claim. *Id.*

Here, Plaintiffs allege that "PFOA and PFOS have characteristics that cause extensive and

persistent environmental contamination,[]" PSAC ¶ 80; CWAS ¶ 108, and that "PFOA and PFOS

contamination presents a serious threat to public health through drinking water." PSAC ¶ 83;

CWAC ¶ 111. Plaintiffs detail that PFAS exposure "has been linked to several diseases, including

kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, and pregnancy-

induced hypertension and low birth weight." PSAC ¶ 82; CWSAC ¶ 110. Plaintiffs further allege

that the PFAS used at the sites "were defective in design and unreasonably dangerous" for similar

reasons. PSAC ¶ 386; CWSAC ¶ 432. And Plaintiffs say that "the foreseeable risk to public health

and welfare posed by 3M's PFAS outweighed the cost to 3M of reducing or eliminating such risk."

PSAC ¶ 388; CWSAC ¶ 434.

The Court finds that Plaintiffs have "managed to plead enough facts to eke out a claim for

a design defect." *Barrett v. Tri-Coast Pharmacy, Inc.*, 518 F. Supp. 3d 810, 826 (D.N.J. 2021).

In *Barrett*, the court ruled that where the plaintiffs alleged that a "pharmaceutical was defectively

designed because it was developed, mixed and/or created in an insanitary and unsafe environment

that contained or promoted the development of harmful organisms such as bacteria, which was ...

unreasonably dangerous[,'", "[the] allegation [was] sufficient to constitute an assertion that the

risk of using the contaminated pharmaceutical outweighs its utility." *Id.* (first alteration in

original) (internal quotation marks omitted).  Likewise, here, Plaintiffs provide detail as to the products' risks and allege that products were "unreasonably dangerous."

The Court finds that Plaintiffs have sufficiently stated a claim for design defect.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion is denied.  An appropriate order accompanies this Opinion.

Dated: December 30, 2021

_____
John Michael Vazquez, U.S.D.J.